

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| SIERRA CLUB, | ) | No.   14-1219 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ENERGY | ) | |
| REGULATORY COMMISSION, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

### PETITION FOR REVIEW

Pursuant to Natural Gas Act § 19(b), 15 U.S.C. §717r(b), and Fed.

R. App. P. 15(a), Sierra Club hereby petitions the Court for review of:

1.     Order of the Federal Energy Regulatory Commission entered

on February 20, 2014 146 FERC ¶ 61,117 and titled "Order Amending

Section 3 Authorization"; and

2.     Federal Energy Regulatory Commission's denial of

Petitioner' request for rehearing of this Order, entered on September

18, 2014 at 148 FERC ¶ 61,200 and titled "Order Denying Rehearing."

1

These two Orders, copies of which are attached hereto, were
entered in Commission docket Sabine Pass Liquefaction, LLC and
Sabine Pass LNG, L.P., CP14-12-001.

Respectfully submitted on November 17, 2014.

By: *Dallie Sivas*

Deborah A. Sivas (Cal. Bar No. 135446)
Alicia E. Thesing (Cal. Bar No. 211751)
Matthew J. Sanders (Cal. Bar No. 222757)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305
Telephone: (650) 723-0325
Email: dsivas@stanford.edu

Michael Robinson-Dorn (Cal. Bar. No. 159507)*
Environmental Law Clinic
University of California, Irvine School of Law
401 E. Peltason Drive, Suite 4500
P.O. Box 5479
Irvine, California 92616-5479
Telephone: (949) 824-1043
Email: mrobinson-dorn@law.uci.edu

Nathan Matthews (Cal. Bar No. 264248)
Sierra Club Environmental Law Program
85 Second St., 2d Fl.
San Francisco, California 94105
Telephone: (415) 977-5695
Email: nathan.matthews@sierraclub.org

Attorneys for Petitioner Sierra Club

* Application to D.C. Circuit


# IN THE UNITED STATES COURT OF APPEALS

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| SIERRA CLUB, | ) | No. 14-1249 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ENERGY | ) | |
| REGULATORY COMMISSION, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

### CORPORATE DISCLOSURE STATEMENT

Petitioner Sierra Club has no parent corporation and no publicly

held corporation owns any of its stock.

Respectfully submitted on November 17, 2014.


By: _/s/ Nathan Matthews_____
Nathan Matthews

Attorney for Petitioner Sierra Club

## CERTIFICATE OF SERVICE

I, Lynda F. Johnston, hereby certify under the penalty of perjury that on November 17, 2014, I served a copy of the foregoing Petition for Review and Corporate Disclosure Statement by United States Mail and electronic mail on the following parties, including all members of the service list in FERC Docket No. CP14-12:

J. Myers
Senior Counsel
Chevron USA Inc.
1600 Smith Street, 27070B
Houston, Texas 77002
jmyers@chevron.com

John P Floom
Edwards & Floom, LLP
1517 King Street
Alexandria, Virginia 22314
jpf@kbelaw.com

Katherine Edwards
Edwards & Floom, LLP
1517 King Street
Alexandria, Virginia 22314
kbe@kbelaw.com

Erica Rancilio
Edwards & Floom, LLP
1517 King Street
Alexandria, Virginia 22314
elr@kbelaw.com

Lisa Tonery
Attorney
Fulbright & Jaworski L.L.P.b
666 Fifth Avenue
New York, New York 10103
lisa.tonery@nortonrosefulbright.com

Tania S. Perez, Esq.
Partner
Fulbright & Jaworski L.L.P.
666 Fifth Avenue
New York, New York 10103
tania.perez@nortonrosefulbright.com

Rina Chang
Senior Counsel, Regulatory
Cheniere Energy, Inc.
700 Milam St.
Suite 800
Houston, Texas 77000
rina.chang@cheniere.com

November 17, 2014.

*Lynda F. Johnston*

LYNDA F. JOHNSTON

# ATTACHMENT 1

## 146 FERC ¶ 61,117
## UNITED STATES OF AMERICA
## FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Cheryl A. LaFleur, Acting Chairman;
Philip D. Moeller, John R. Norris,
and Tony Clark.

Sabine Pass Liquefaction, LLC                                    Docket No. CP14-12-000
Sabine Pass LNG, L.P.

### ORDER AMENDING SECTION 3 AUTHORIZATION

(Issued February 20, 2014)

1.      On October 25, 2013, Sabine Pass Liquefaction, LLC (Sabine Liquefaction)
and Sabine Pass LNG, L.P. (Sabine Pass LNG) (collectively, Sabine Pass)[1] filed an
application to amend the order issued in *Sabine Pass Liquefaction, LLC*, on April 16,
2012.[2] The 2012 Order authorized Sabine Pass under section 3 of the Natural Gas Act
(NGA) and the Commission's regulations[3] to site, construct, and operate facilities for the
liquefaction and export of domestically-produced natural gas at the existing Sabine Pass
Liquefied Natural Gas (LNG) terminal (Liquefaction Project). In this proceeding, Sabine
Pass seeks approval of an increase of the Liquefaction Project's authorized maximum
peak day LNG production capacity from approximately 2.2 to approximately 2.76 billion
cubic feet (Bcf) per day. This order grants the requested authorization subject to
conditions, as discussed below.

---

[1] Sabine Pass LNG and Sabine Pass Liquefaction are subsidiaries of Cheniere
LNG, Inc., which is a subsidiary of Cheniere Energy, Inc.

[2] *Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.*, 139 FERC ¶ 61,039
(2012) (2012 Order), *reh'g denied*, 140 FERC ¶ 61,076 (2012).

[3] 18 C.F.R. Pt. 153 (2013).

Docket No. CP14-12-000                                                    - 2 -

## I.    Background and Proposal

2.       In 2004, the Commission authorized Sabine Pass LNG under section 3 of the
NGA to site, construct, and operate an LNG terminal to import foreign-sourced LNG.[4]
Subsequently, in 2009, the Commission issued an order amending Sabine Pass LNG's
section 3 authorization to allow use of the terminal facilities to export LNG that had been
previously imported into the United States and stored at the Sabine Pass LNG terminal in
liquid form.[5]

3.       The 2012 Order authorized Sabine Pass to site, construct, and operate facilities
designed to liquefy domestic natural gas delivered by nearby pipelines, store the LNG in
the terminal's storage facilities, and deliver the LNG from the storage tanks into marine
vessels for export.[6]  As relevant to this proceeding, the 2012 Order authorized the
construction and operation of four LNG process trains in two stages (Trains 1 and 2 in
Stage 1 and Trains 3 and 4 in Stage 2) with a total LNG production capacity of 16 million
tons per year (mtpa), or 2.2 Bcf per day (approximately 4 mtpa per train).[7]

4.       Sabine Pass states that it calculated the original capacity of 4.0 mtpa per LNG
train using "conservative" design and operating assumptions provided by its contractor,
process licensors, and equipment vendors.  Sabine Pass states that this capacity reflects
an anticipated average annual capability which may be less than the actual capability of
the project in any particular year.  Sabine Pass asserts that through the design progression
of the Liquefaction Project, it has obtained more precise information detailing the
equipment specifications applicable to the project.  In addition, Sabine Pass states that it

---

[4] *Sabine Pass LNG, L.P.*, 109 FERC ¶ 61,324 (2004).  The Sabine Pass LNG
terminal is located in Cameron Parish, Louisiana, on the eastern shore of the Sabine Pass
Channel, opposite the Town of Sabine Pass, Texas.

[5] *Sabine Pass LNG, L.P.*, 127 FERC ¶ 61,200 (2009).

[6] In *Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.*, 144 FERC
¶ 61,099 (2013) (2013 Order), the Commission amended the 2012 Order to authorize
certain facility modifications to accelerate construction of the Liquefaction Project
(Modification Project).

[7] On September 30, 2013, Sabine Pass filed an application in Docket
No. CP13-552-000 requesting authorization to site, construct, and operate two additional
LNG process trains (Trains 5 and 6 in Stage 3) with a combined LNG production
capacity of 503 Bcf per year, which is equivalent to approximately 1.38 Bcf per day, or
approximately 0.69 Bcf per day per train.

Docket No. CP14-12-000                                                          - 3 -

has implemented certain design changes approved through the Commission's implementation plan review process[8] that result in higher LNG production capability, including: (1) the addition of inlet air humidification to the gas turbines driving the refrigerant compressors, thus increasing the turbines' power at high ambient temperatures to produce more LNG; (2) optimization of refrigerant gas compressors through better definition of certain design characteristics, such as the impeller design, resulting in increased efficiency and higher LNG production; and (3) sizing of piping and equipment to minimize pressure drop and otherwise optimize equipment and systems to perform more efficiently. Sabine Pass asserts that these design changes will remove bottlenecks and result in more LNG production using the same power provided by the turbines.

5.      Sabine Pass, therefore, proposes the combined, authorized LNG production capacity for the four LNG trains comprising Stages 1 and 2 of the Liquefaction Project be increased from the currently authorized approximately 16 mpta, or 2.2 Bcf per day, to approximately 20 mtpa, or 2.76 Bcf per day.[9] Sabine Pass explains that the proposed increase in the production capacity represents the maximum or peak LNG production and export capability of the trains under optimal operating conditions, such as cooler ambient temperatures that increase turbine power and implementation of enhanced operations and maintenance processes that promote production efficiencies. Sabine Pass states that its proposal requires no additional construction or modification of previously authorized facilities and that the Liquefaction Project can achieve its maximum LNG production level while remaining in full compliance with applicable air emission and other regulatory requirements.[10]

---

[8] Letter Order Granting Approval to Construct Final Design, *Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.*, Docket No. CP11-72-000 (June 7, 2013).

[9] The requested increased daily capacity is equivalent to approximately 20 mtpa (1,006 Bcf per year, divided by the currently authorized 803 Bcf per year, times the currently authorized capacity of 16 mtpa, which equals approximately 20 mtpa).

[10] In orders dated September 7, 2010 and May 20, 2011, the Department of Energy's (DOE) Office of Fossil Energy, issued Sabine Pass Liquefaction authorization to export up to 16 mtpa, or 2.2 Bcf per day, to all Free Trade Agreement and non-Free Trade Agreement nations, finding that the potential export of such volumes not inconsistent with the public interest. Sabine Pass acknowledges that it will need to receive additional authorization from DOE to export more than 16 mtpa.

Docket No. CP14-12-000                                                    - 4 -

## II.  Public Notice

6.      Notice of Sabine Pass's application was published in the *Federal Register* on
November 7, 2013, with interventions and protests due on or before November 14,
2013.[11]  Chevron U.S.A. Inc. and Sierra Club filed timely, unopposed motions to
intervene.  Timely, unopposed motions to intervene are granted by operation of Rule 214
of the Commission's Rules of Practice and Procedure.[12]

7.      Sierra Club's motion to intervene included a protest and comments.  Sabine Pass
filed an answer to Sierra Club's protest and comments.  Sierra Club filed an answer to
Sabine Pass's answer.  Answers to protests and answers to answers are not permitted
under the Commission's Rules.[13]  Nevertheless, the Commission will accept the answers
because they provide information that will assist in our decision making.[14]

8.      Sierra Club's comments are addressed in the Environmental Assessment (EA) and
are discussed further below.

## III.  Discussion

9.      Because the proposal involves the export of natural gas to foreign countries, the
amended operation of the previously authorized facilities requires Commission approval
under NGA section 3.[15]  While section 3(a) provides that an application shall be approved

---

[11] 78 Fed. Reg. 66,909.

[12] 18 C.F.R. § 385.214(b)(2)(iii) (2013).

[13] 18 C.F.R. § 385.213(a)(2) (2013).

[14] *Id.*

[15] 18 C.F.R. § 153.5 (2013).  The regulatory functions of section 3 were
transferred to the Secretary of Energy in 1977 pursuant to section 301(b) of the
Department of Energy Organization Act.  42 U.S.C. § 7151(b) (2006).  In reference to
regulating the imports or exports of natural gas, the DOE Secretary subsequently
delegated to the Commission the authority to approve or disapprove the construction and
operation of particular facilities, the site at which facilities shall be located, and with
respect to natural gas that involves the construction of new domestic facilities, the place
of entry for imports or exit for exports.  The Secretary's current delegation of authority to
the Commission relating to import and export facilities was renewed by the Secretary's
DOE Delegation Order No. 00-044.00A, effective May 16, 2006.  Applications for
authorization to import or export natural gas (the commodity) must be submitted to DOE.

if the proposal "will not be inconsistent with the public interest," section 3 also provides that an application may be approved "in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate."[16] Section 3(a) also provides that for good cause shown, the Commission may make supplemental orders as it may find "necessary or appropriate."

10.     Sierra Club contends that increased exports of LNG will have economic harms such as raising domestic gas prices, eliminating jobs in manufacturing and other domestic industries, and transferring wealth from working class families to large corporations.  As discussed in the 2012 Order, DOE has exclusive jurisdiction over the export of natural gas as a commodity.  DOE has delegated to the Commission authority to approve or disapprove the construction and operation of particular facilities, the site at which such facilities will be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports.  However, the DOE Secretary has not delegated to the Commission any authority to approve or disapprove the import or export of the commodity itself or to consider the type of issues raised by Sierra Club, as part of the Commission's public interest determination.[17]  Thus, the issue of whether the export of LNG will cause economic harm is beyond the Commission's purview.  Our authorization alone will not enable the export of any additional volumes of LNG.

11.     Sabine Pass requests that the currently-authorized total LNG production capacity of Stages 1 and 2 of the Liquefaction Project of 2.2 Bcf per day (or 16 mtpa equivalent) be increased to a maximum capacity of approximately 2.76 Bcf per day (or 20 mtpa equivalent).  The proposed change does not involve the construction of new facilities or the modification of previously authorized facilities.  The proposed LNG production capacity of approximately 2.76 Bcf per day represents the combined, maximum or peak capacity of the four LNG trains based on the final, optimized design of the Liquefaction Project, including the facilities approved through the Commission's implementation plan review process, rather than conservatively estimated nominal capacity.

12.     We recognize that an accurate calculation of the maximum or peak capacity at optimal conditions may not be possible at the time an initial application for construction

---

[16] For a discussion of the Commission's authority to condition its approvals of LNG facilities under section 3 of the NGA, *see, e.g., Distrigas Corporation v. FPC,* 495 F.2d 1057, 1063-64 (D.C. Cir. 1974), *cert. denied,* 419 U.S. 834 (1974) and *Dynegy LNG Production Terminal, L.P.,* 97 FERC ¶ 61,231 (2001).

[17] 2012 Order 139 FERC ¶ 61,039 at P 27 (2012) (citing *National Steel Corp.,* 45 FERC ¶ 61,100, at 61,333 (1988)).

Docket No. CP14-12-000                                                              - 6 -

is filed. However, we believe that it is appropriate for an ultimate authorization to reflect the maximum or peak capacity at optimal conditions as such a level represents the actual potential production of LNG. Thus, based on Sabine Pass's more detailed engineering analysis of the Liquefaction Project, we find that an increase in the authorized LNG production capacity to a combined maximum of approximately 20 mtpa, or 2.76 Bcf per day, is not inconsistent with the public interest.[18] We note that Sabine Pass's proposal herein is consistent with its requested capacity authorization in the pending application in Docket No. CP13-552-000 to construct and operate Stage 3 of the Liquefaction Project.[19]

## IV.    **Environmental Review**

13.    To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA), our staff prepared an EA for Sabine Pass's proposal. The EA addressed air quality, cumulative impacts, and alternatives. On January 24, 2014, the EA was placed in the public record of this proceeding. Sierra Club's comments were addressed in the EA and are summarized below.

14.    Sierra Club contends that changing the authorized maximum production capacity of the Liquefaction Project will cause an increase in environmental impacts from induced gas production and pipeline transportation. As part of its NEPA analysis, the Commission considers the potential environmental impacts of natural gas production and development occurring in the project area as part of the cumulative impacts analysis to the extent that there is meaningful information available to assist the Commission's decision-making process in a particular proceeding.[20] With respect to production and development activities that are not within the project area, the Commission will determine whether such activities should be included in the EA or EIS based upon a fact-specific analysis. Council on Environmental Quality (CEQ) regulations require agencies

---

[18] The annual capacity available for export can never reach 20 mtpa because the facilities are unable to operate at peak capacity every day of the year. Consequently, Sabine Pass has contracted to export only 18 mtpa, subject to receipt of all required export authorizations from DOE. *See* 2013 Order, 144 FERC ¶ 61,099 at P 4.

[19] As noted above, Stage 3 consists of two additional LNG trains with a combined LNG production capacity of 503 Bcf per year, which is equivalent to approximately 1.38 Bcf per day, or approximately 0.69 Bcf per day per train. This is the same LNG production capacity per train that is proposed herein.

[20] *See, e.g., Central New York Oil & Gas Company, LLC,* 137 FERC ¶ 61,121 at PP 96-100 (2012); *order on reh'g,* 138 FERC ¶ 61,104 at P 48 (2012); *see also Sabine Pass Liquefaction, LLC,* 140 FERC ¶ 61,076 at P 11 (2012).

to consider environmental effects of proposed actions, including direct and indirect effects, if these effects are "reasonably foreseeable."[21] Where appropriate, the Commission will evaluate the specific facts to determine whether natural gas production and development is a "reasonably foreseeable" direct or indirect result of construction and operation of the project under consideration, or whether such activities are too speculative or attenuated to warrant inclusion in the EA or EIS.[22]

15.     The issue of environmental impacts from induced production and pipeline transportation was addressed in the 2012 Order.[23] The 2012 Order observed that impacts which may result from additional shale gas development are not "reasonably foreseeable" and that such additional development, or any correlative potential impacts, is not an "effect" of the Liquefaction Project for purposes of a cumulative impacts analysis. The 2012 Order pointed out that no specific shale-gas play had been identified and that the Liquefaction Project did not depend on additional shale gas production, which may occur for reasons unrelated to the project and over which the Commission has no control, such as state permitting for additional gas wells.

16.     Sierra Club also asserts that the proposal would cause an increase in emissions of air pollutants and greenhouse gases from the Liquefaction Project. Staff's EA did consider the environmental effect of potential additional production under the amendment. The EA concludes that operating at the "maximum design capacity" in a particular year, as proposed, would not alter any of the design parameters used in the previous air quality modeling analysis discussed in the Liquefaction Project's EA. The EA makes this determination because there will be no changes to the factors that influence air modeling (e.g., emission rates, air/fuel ratios, exit stack temperatures, and exit flow rates). The modeling was performed based on continuous operation of the gas turbines and other emissions sources operating at 100 percent load for Trains 1-4 at their maximum design capacity. The proposal's increase in authorized production has already been included in our air modeling which is based on maximum emissions generated from Trains 1-4 operated at maximum capacity. Potential to emit was based on continuous operation (8,760 hours per year) at 100 percent load for Trains 1-4 except for standby engines, for which potential to emit is based on 500 hours per year of operation.[24]

---

[21] 40 C.F.R. § 1508.8 (2013).

[22] *Central New York Oil & Gas Company, LLC,* 137 FERC ¶ 61,121 at PP 88-94.

[23] 2012 Order, 139 FERC ¶ 61,039 at PP 94-99.

[24] Liquefaction Project EA, at 2-55 through 2-57.

17.     Further, the 2012 Order notes that Sabine Pass has obtained all necessary air
permits for the Liquefaction Project from the Louisiana Department of Environmental
Quality (LDEQ).[25] The EA in this proceeding restates that the Liquefaction Project EA
analysis demonstrates that the Liquefaction Project will be in compliance with National
Ambient Air Quality Standards.[26] The Liquefaction Project EA identified the potential
annual emissions for criteria pollutants and hazardous air pollutants for both the
Liquefaction Project and the existing Sabine Pass LNG Terminal in Table 2.7-7 and for
potential annual greenhouse gas emissions in Table 2.7-8.[27] The emissions data included
in the Liquefaction Project EA were based on Environmental Protection Agency emission
factors, applicable federal and/or state regulatory emission limitation, and manufacturer-
supplied emissions factors.

18.     Sierra Club contends that Sabine Pass's proposal would increase emissions from
shipping vessels. The Liquefaction Project EA analyzed emissions in Louisiana and
Texas from 400 ships per year (up to 250,000 cubic meters in size) which included LNG
carrier cruising, transit hoteling, and unloading. Sabine Pass's request in this application
does not require an increase in the number of vessels, dredging to the area to
accommodate larger vessels, a relocation of the berthing area, or changes to the
loading/unloading rate for the vessels. As stated in the EA, the vessel emissions were
previously evaluated, and the request herein will not result in a change in total facility
and marine emissions.

19.     Sierra Club argues that the Commission's NEPA review should consider
connected actions and cumulative impacts in a single environmental document that
includes other projects in the area and Sabine Pass's pending applications for interrelated
liquefaction and pipeline projects. Sierra Club points out that in Docket No.
CP13-552-000, Sabine Pass proposes to site, construct, and operate two additional LNG
process trains (Trains 5 and 6) and, in Docket No. CP13-553-000, Cheniere Creole Trail
L.P. proposes to construct and operate a compressor station and 104.3 miles of pipeline to

_____

[25] On December 6, 2011, LDEQ issued a Title V Permit 0560-00214-V3 and
Prevention of Significant Deterioration (PSD) Permit PSD-LA-703(M3) authorizing
the continued operation of the Sabine Pass LNG Terminal and the operation of the
Liquefaction Project (Trains 1 through 4 and associated equipment). On March 22, 2013,
LDEQ issued a modified Title V Permit 0560-00214-V4 and PSD Permit PSD-LA-
703(M4) in connection with certain modifications to the Liquefaction Project authorized,
in part, by the Commission in the 2013 Order.

[26] Liquefaction Project EA, at 2-60.

[27] *Id.,* at 2-55 through 2-57.

deliver natural gas to the Liquefaction Project. The Commission is aware of these pending applications but has not completed its environmental review of the proposed facilities. As stated in the EA, Sabine Pass's request here does not involve any new construction or modification of existing facilities. Consequently, the request in this application would not contribute to any cumulative impacts. The 2012 Order acknowledged the possibility of other LNG projects in the Gulf Coast area but could not meaningfully analyze the potential environmental impact of possible future projects.[28]

20. Based on the analysis in the EA, we have determined that if Sabine Pass operates the Liquefaction Project in accordance with its application and supplements, approval of Sabine Pass's proposal herein would not constitute a major federal action significantly affecting the quality of the human environment.

21. At a hearing held on February 20, 2014, the Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application(s), as supplemented, and exhibits thereto, submitted in support of the authorizations sought herein, and upon consideration of the record,

The Commission orders:

(A) The authorized LNG production capacity of the Liquefaction Project's Stages 1 and 2 facilities granted in the 2012 Order is amended, as discussed in the body of this order.

(B) In all other respects, the authorizations granted in the 2012 Order shall remain in full force and effect.

(C) Sabine Pass shall notify the Commission's environmental staff by telephone, e-mail, and/or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Sabine

---

[28] 2012 Order, 139 FERC ¶ 61,039 at PP 88-91. The order did note that the Freeport LNG proposal in Texas would use mostly electric-driven equipment and thus would be unlikely to contribute additional significant quantities of greenhouse emissions and would be outside of the air quality control region in which Sabine Pass is located. The order also observed that the proposed Cheniere Corpus Christi LNG facility would be located outside of the same air quality control region as the Sabine Pass LNG terminal.

Docket No. CP14-12-000                                           - 10 -

Pass.  Sabine Pass shall file written confirmation of such notification with the Secretary
of the Commission within 24 hours.

By the Commission.

( S E A L )


                              Nathaniel J. Davis, Sr.,
                              Deputy Secretary.

Document Content(s)

CP14-12-000.DOCX........................................................1-10

# ATTACHMENT 2

148 FERC ¶ 61,200
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Cheryl A. LaFleur, Chairman;
                       Philip D. Moeller, Tony Clark,
                       and Norman C. Bay.

Sabine Pass Liquefaction, LLC                    Docket No.  CP14-12-001
Sabine Pass LNG, L.P.

ORDER DENYING REHEARING

(Issued September 18, 2014)

1.      On March 24, 2014, Sierra Club filed a timely request for rehearing of the order
issued in *Sabine Pass Liquefaction, LLC*, 146 FERC ¶ 61,117 (2014) (February 20
Order).  The February 20 Order amended a 2012 Order that authorized Sabine Pass LNG,
L.P. (Sabine Pass) to site, construct, and operate facilities for the liquefaction and export
of domestically-produced natural gas at the existing Sabine Pass Liquefied Natural Gas
(LNG) terminal in Cameron Parish, Louisiana (Liquefaction Project).[1]  Specifically, the
February 20 Order approved Sabine Pass's requested increase in the Liquefaction
Project's authorized maximum peak day LNG production capacity to reflect the
previously-authorized facilities' capabilities under optimal operating conditions.  For the
reasons discussed below, the Commission will deny Sierra Club's request for rehearing.

I.      **Background**

2.      Sabine Pass operates an LNG terminal in Cameron Parish, Louisiana, which was
authorized in 2004 under section 3 of the Natural Gas Act (NGA) to import foreign-
sourced LNG.[2]  In 2009, Sabine Pass was authorized to use the terminal facilities to
export LNG that had previously been imported and stored at the terminal.[3]  In 2012, the
Commission authorized Sabine Pass to site, construct, and operate facilities at its existing
LNG terminal to liquefy domestic natural gas delivered by nearby pipelines, store the

---

[1] *Sabine Pass LNG, L.P.*, 139 FERC ¶ 61,039 (2012) (2012 Order), *reh'g denied,*
140 FERC ¶ 61,076 (2012) (2012 Rehearing Order).

[2] *Sabine Pass LNG, L.P.*, 109 FERC ¶ 61,324 (2004).

[3] *Sabine Pass LNG, L.P.*, 127 FERC ¶ 61,200 (2009).

LNG in the terminal's storage facilities, and deliver the LNG from the storage tanks into marine vessels for export, i.e., the Liquefaction Project. As relevant here, the 2012 Order authorized the construction and operation of four LNG process trains in two stages (Trains 1 and 2 in Stage 1 and Trains 3 and 4 in Stage 2) with a total LNG production capacity of 16 million tons per year (mtpa), or 2.2 billion cubic feet (Bcf) per day. In August 2013, the Commission amended the 2012 Order to authorize certain facility modifications (Modification Project) to the Liquefaction Project.[4] Commission staff issued environmental assessments (EAs) for the Liquefaction and Modification Projects on December 28, 2011(Liquefaction Project EA) and April, 24, 2013 (Modification Project EA), respectively.[5] The Liquefaction Project is currently under construction.

3.      On October 25, 2013, Sabine Pass filed an application to amend the previously-issued authorization for the Liquefaction Project, stating that the actual potential production capability of the project in any particular year exceeds the authorized production capacity. Specifically, Sabine Pass determined, based on more recent, detailed engineering analysis and certain design changes approved through the Commission's post-authorization final design and approval process, that it could, on any given day, under optimal operating conditions, produce more LNG than originally estimated, using the same power from its turbines and other already authorized facilities. Therefore, Sabine Pass requested an increase in the authorized combined production capacity for the four LNG trains comprising Stages 1 and 2 from approximately 16 mtpa, or 2.2 Bcf/d, to 20 mtpa, or 2.76 Bcf/d.[6] Sabine Pass emphasized that the proposed increase in maximum production capacity represents the peak LNG production and export capability of the trains under optimal operating conditions. Sabine Pass stated that its proposal requires no additional construction or modification of previously authorized facilities. The February 20 Order found that it is appropriate for authorizations to reflect

---

[4] *Sabine Pass Liquefaction, LLC,* 144 FERC ¶ 61,099 (2013).

[5] On September 30, 2013, Sabine Pass Liquefaction Expansion, LLC (Sabine Pass Expansion), an affiliate of Sabine Pass, filed an application in Docket No. CP13-552-000 to further expand the Liquefaction Project by adding Trains 5 and 6 in Stage 3. Together, Trains 5 and 6 would produce an additional 503 Bcf of LNG per year and have a nameplate capacity rating of 9 mtpa of LNG. Concurrently, Cheniere Creole Trail Pipeline, L.P. (Creole Trail) filed an application in Docket No. CP13-553-000 to construct 104.3 miles of pipeline and 53,000 horsepower of compression to deliver additional feed gas to the Liquefaction Project. Those applications are pending.

[6] In 2010 and 2011, the United States Department of Energy (DOE) authorized Sabine Pass to export up to 16 mtpa, or 2.2 Bcf/d, to all Free and non-Free Trade Agreement nations. Sabine Pass acknowledges it will need additional authorization from DOE to export more than 2.2 Bcf/d.

the maximum or peak capacity at optimal conditions, as such level represents the actual potential production of LNG. Thus, the February 20 Order determined that Sabine Pass's proposals were not inconsistent with the public interest under section 3 of the NGA. In reaching this conclusion, the Commission addressed the issues raised by Sierra Club in its protest.

## II.    Request for Rehearing

4.     In its petition for rehearing, Sierra Club contends that the February 20 Order failed to examine (1) the "no action" alternative; (2) numerous direct or indirect adverse environmental impacts from increased LNG production, including increased air emissions from gas pretreatment activities and compressor stations and other pipeline equipment necessary to deliver increased gas volumes to the terminal site, and increased shipping traffic; (3) Sabine Pass Liquefaction Expansion's (Sabine Pass Expansion) proposal to construct and operate Trains 5 and 6 and Creole Trail's proposal to construct pipeline and compression facilities, as connected and cumulative actions; and (4) the indirect, reasonably foreseeable effects of induced gas production, increased natural gas prices, and increased domestic use of coal. Sierra Club also contends the Commission failed to coordinate with the United States Department of Energy (DOE) and that an environmental impact statement (EIS) was required.

## III.   Discussion

5.     Sierra Club maintains that the February 20 Order and Commission staff's January 2014 EA in this proceeding violated the National Environmental Policy Act (NEPA) by failing to examine the environmental effects of the no-action alternative.[7] Sierra Club argues that NEPA requires the Commission to compare the environmental effects of the currently-authorized maximum LNG production capacity (2.2 Bcf/d) of the Liquefaction Project and the proposed maximum capacity (2.76 Bcf/d), while maintaining the same assumptions about facility design and ambient conditions. Sierra Club claims that under the no-action alternative, which would deny Sabine Pass's application for an increase in the authorized total LNG production capacity of the Liquefaction Project, emissions from different sources at the facility will decrease by 20 percent relative to the levels contemplated in the 2011 Liquefaction Project EA, or put differently, these emissions will be 25 percent higher under the proposed action as compared to the no-action

---

[7] NEPA requires agencies to prepare a statement on the environmental impact of major Federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C)(i) (2012). The Council on Environmental Quality's (CEQ) regulations require the environmental analysis for a proposed action to "evaluate all reasonable alternatives," including the no-action alternative. 40 C.F.R. § 1502.14(d) (2014).

Docket No. CP14-12-001                                                                        - 4 -

alternative.[8]  In the EA for this proceeding, staff noted that the Commission had already found construction of all the facilities necessary to achieve the higher level of production to be in the public interest.  The EA did not recommend the no-action alternative,[9] reasoning that to do so would not be consistent with the Commission's previous authorization of those facilities in conjunction with the Liquefaction Project.

6.       In addition, contrary to Sierra Club's claim, the EA did consider the environmental effect of potential additional production under the proposed amendment.  As explained in the February 20 Order, the EA determined that there will be no changes to the factors that influence air quality modeling (e.g., emission rates, air/fuel ratios, exit stack temperatures, and exit flow rates).  Thus, operation of the facilities at the maximum design capacity when possible, as proposed, would not alter any of the design parameters used in the previous air modeling analysis discussed in the Liquefaction Project EA.[10] The previous air modeling was based on maximum emissions to be generated from Trains 1-4 operating continuously at 100 percent load, even though Sabine Pass's production projects reflected, for example, conservative assumptions on downtimes for maintenance.[11]  Thus, impacts associated with the increase being approved here were captured in that earlier modeling.[12]  Moreover, the February 20 Order notes that Sabine Pass has obtained all necessary air permits for the Liquefaction Project, as modified in 2013, from the Louisiana Department of Environmental Quality.[13]

7.       Sierra Club further argues that the February 20 Order failed to discuss certain direct or indirect adverse environmental impacts from the additional LNG production, including increased emissions from Sabine Pass's gas pretreatment activities[14] and from

---

[8] Rehearing request at 3.  Sierra Club also contends that the EA was based on outdated information.  Sierra Club, however, fails to identify any information in the record of this proceeding that is stale or outdated.

[9] EA, Part B.

[10] February 20 Order, 146 FERC ¶ 61,117 at P 16.

[11] Sabine Pass's December 31, 2013 supplemental response to staff's November 13, 2013 environmental data request.

[12] *Id.*

[13] *Id.* P 17.

[14] Sabine Pass's gas pre-treatment system removes solids, carbon dioxide, sulfur dioxide, hydrogen sulfide, particulate matter, volatile organic compounds, nitrogen oxide, water, and mercury from the gas stream before the resulting dry gas enters the refrigeration systems for liquefaction.

Docket No. CP14-12-001                                                                 - 5 -

Creole Trail's compressor stations and its proposed pipeline necessary to deliver increased volumes to the terminal site. We disagree. Sierra Club's argument assumes that the Liquefaction Project will receive and process additional supplies of domestic natural gas in order to achieve the increase in authorized production capacity that the February 20 Order approved.[15] However, there has been no proposed increase in the capacity of pipelines capable of delivering gas to the Sabine Pass LNG terminal made in conjunction with the instant proposal. Instead, the contemplated increase in production, which we emphasize will be achievable only under optimal operating conditions and not on a daily basis, will be the result of design changes and engineering efficiencies which allow more effective use of the power available.[16] Because Sabine Pass does not propose design or operational changes to the gas turbines, the EA in this proceeding also noted that there would be no increase in fuel gas usage.[17] Thus, the authorization in the February 20 Order will not result in additional air emissions beyond those already considered in our 2012 authorization of the Liquefaction Project, as amended in 2013.

8.      Sierra Club also incorrectly contends that the February 20 Order failed to discuss the environmental effects of increases in shipping traffic beyond the current maximum of 400 ships per year (up to 250,000 cubic meters in size) and increased associated emissions and that the Commission did not justify its vessel size and frequency assumptions. We disagree.

9.      The February 20 Order explained, as discussed in the EA, that the environmental review of the Liquefaction Project had evaluated impacts of vessel emissions based on a maximum of 400 ships per year and a maximum vessel size of 250,000 cubic meters and that Sabine Pass's request to increase the maximum authorized peak production capacity did not contemplate or require any increase in the number of vessels, dredging to the area to accommodate larger vessels, a relocation of the berthing area, or changes to the loading/unloading rate for the vessels. Thus, the request will not result in a change in total facility and marine emissions beyond those previously studied.[18] Sierra Club's claim that the capability to produce additional volumes will necessarily require shipping

---

[15] Rehearing request at 4 ("Thus, it appears that each of these [pollution] streams would increase by 25% *if the volume of gas subject to pretreatment increased by that amount.*" (Emphasis added.)); *Id.* at 6 ("The [Creole Trail] pipeline modifications are particularly relevant, because they may be necessary to deliver the additional gas to the facility that will be processed pursuant to the requested output increase….").

[16] Those design and engineering efficiencies are explained in detail in the February 20 Order at P 4.

[17] EA, Part A.

[18] February 20 Order, 146 FERC ¶ 61,117 at P 18.

Docket No. CP14-12-001                                                                                        - 6 -

capacity beyond the 400 ships per year previously studied is unsupported.[19] Our analysis of potential impacts of the Liquefaction Project was generally based on conservative projections, i.e., activity levels higher than those which would necessarily be achieved under day-to-day operations and despite the authorized increase in maximum peak day production, increased production is not anticipated to be achievable on a daily basis. Sierra Club also asserts for the first time that the Commission must explore as part of its environmental analysis here whether the expanded output could be exported by fewer or smaller ships than were analyzed in the Liquefaction Project EA. We disagree. To the extent Sierra Club seeks a reduction in the maximum number or size of ships, such action is beyond the scope of this proceeding.

10.     Sierra Club asserts that the February 20 Order fails to consider the Sabine Pass Expansion proposal to construct Trains 5 and 6 and the Creole Trail proposal to construct compression facilities as "connected actions,"[20] or the cumulative impacts[21] of those proposals. Sierra Club contends that Creole Trail's proposed pipeline modifications may be necessary to deliver additional gas to the Liquefaction Project to increase LNG production as requested in this proceeding.

11.     As previously noted in this order, the increase in maximum LNG production capacity authorized by the February 20 Order will be accomplished as the result of design changes and engineering efficiencies; no additional natural gas transportation capacity is contemplated in connection with this change, nor does Sabine Pass's proposed increase in authorized production capacity depend on the construction and operation of Trains 5 and 6. Accordingly, Creole Trail's proposed pipeline additions and Sabine Pass Expansion's proposed Trains 5 and 6 are not interrelated actions that are necessary to the February 20

---

[19] Rehearing request at 5 ("Increasing exports by 25% presumably requires 25% more shipping capacity . . .").

[20] 40 C.F.R. § 1508. 25(a)(1) (2014). Connected actions are "closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

    (i)     Automatically trigger other actions which may require environmental impact statements.

    (ii)    Cannot or will not proceed unless other actions are taken previously or simultaneously.

    (iii)   Are interdependent parts of a larger action and depend on the larger action for their justification."

[21] 40 C.F.R. § 1508.25(a)(2) (2014).

Order's establishment of an increased maximum production authorization for the previously authorized Liquefaction Project facilities, and Sierra Club's contention that they are connected actions is not correct. Moreover, as explained in the EA and the February 20 Order, since the proposed action involves no new construction or modification of existing facilities, it will not contribute to any cumulative impacts.[22]

12.    Sierra Club further argues that the February 20 Order failed to consider the "indirect effects" of LNG exports on gas production and pricing, including inducement of additional natural gas production and increases in domestic coal consumption that will result from higher gas prices.[23] Relying on the Energy Information Agency's (EIA) January 2012 LNG Export Study, Sierra Club asserts that these indirect effects are reasonably foreseeable. In addition, Sierra Club claims that Commission's environmental analysis must consider the effects of the DOE action approving the exportation of additional LNG.[24]

13.    We believe the February 20 Order adequately addressed these issues, which were also raised and addressed in the 2012 Order authorizing construction of the Liquefaction Project.[25] First, with respect to economic harms, such as raising domestic gas prices, consistent with the 2012 Order, the February 20 Order explained that DOE has not delegated to the Commission any authority to approve or disapprove the import or export of natural gas as a commodity or to consider the economic arguments raised by Sierra

---

[22] EA, Part B; February 20 Order, 146 FERC ¶ 61,117 at P 19. The February 20 Order also acknowledged the possibility of other LNG projects in the Gulf Coast area, but noted that the 2012 Order stated that it could not meaningfully analyze the potential environmental impact of possible future projects. *Id.* Sierra Club does not challenge this finding.

[23] As defined in CEQ regulations, indirect effects are

"caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508(b) (2014).

[24] Rehearing request at 7-8.

[25] The EA in Part B noted that these issues were discussed in the Liquefaction Project EA.

Club as part of the Commission's public interest determination.[26] Thus, the issue of whether the export of LNG will cause economic harm is beyond the Commission's purview. Second, with respect to the issue of environmental impacts from induced production, the February 20 Order again referenced the 2012 Order, which explained that the impacts which may result from additional shale gas development are not "reasonably foreseeable." The 2012 Order stated that no specific shale gas play had been identified and that the Liquefaction Project did not depend on additional shale gas production, which may occur for reasons unrelated to the project and over which the Commission has no control.[27] In addition, the 2012 Rehearing Order explained that Sierra Club's reliance on the EIA Export Study is misplaced because the report cautions that projections of energy markets over the long term are highly uncertain and subject to unforeseen events.[28]

14.    Sierra Club contends that the Commission failed to consult or coordinate with DOE, a cooperating agency for the Liquefaction Project, in reviewing the application in this proceeding and that the Commission failed to explain the relationship between the proposal here and DOE action. We disagree. The February 20 Order clearly states that Sabine Pass will need to receive additional authorization from DOE to export more than 2.2 Bcf/d of LNG.[29] The February 20 Order also explains that DOE has exclusive jurisdiction over the export of natural gas as a commodity; DOE has delegated to the Commission authority to approve or disapprove the construction and operation of particular facilities, the site at which such facilities will be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports.[30] In addition, the Commission has previously addressed the role of DOE as a cooperating agency in the Commission's approval of the Liquefaction Project.[31] Under CEQ regulations, upon the request of the lead agency (in this case, the Commission), any other Federal agency which has jurisdiction by law shall be a cooperating agency.[32] The Commission requested DOE to be a cooperating agency in the

---

[26] February 20 Order, 146 FERC ¶ 61,117 at P 10 and fn. 17; 2012 Order, 139 FERC ¶ 61,039 at P 27 (citing *National Steel Corp.*, 45 FERC ¶ 61,100, at 61,333 (1998)).

[27] February 20 Order, 146 FERC ¶ 61,117 at P 15 (citing 2012 Order, 139 FERC ¶ 61,039 at PP 94-99).

[28] 2012 Rehearing Order, 140 FERC ¶ 61,076 at P 14 (2012).

[29] February 20 Order, 146 FERC ¶ 61,117 fn.10.

[30] *Id.* P 10.

[31] 2012 Rehearing Order, 140 FERC ¶ 61,076 at PP 31-32.

Docket No. CP14-12-001                                                           - 9 -

preparation of the Liquefaction Project EA in light of DOE's earlier grant of authorization to Sabine Pass to export up to 2.2 Bcf/d of LNG.[33]  Here, the Commission did not request DOE to be a cooperating agency because, unlike the Liquefaction Project, no new export facilities were proposed.

15.     Finally, Sierra Club contends that the Commission should have prepared a full environmental impact statement (EIS), because there is a "substantial question" as to whether emissions from pipeline gas delivery and pretreatment associated with the proposed action will have significant impacts, citing to CEQ draft guidance on NEPA and greenhouse gas (GHG) emissions.[34]  Sierra Club made a similar assertion in connection with the Liquefaction Project proposal.  In rejecting this argument, the 2012 Rehearing Order stated that the CEQ draft guidance on NEPA and GHG emissions contains a triggering level for considering GHG emissions in a NEPA analysis and is not an indicator of "significance" for NEPA purposes; rather it is an indicator that a quantitative or qualitative analysis of GHG emissions may be meaningful to decision makers.[35]  Accordingly, Sabine Pass's proposal does not constitute a significant impact on the quality of the human environment that would warrant preparation of an EIS.

The Commission orders:

       Sierra Club's March 24, 2014 request for rehearing is denied, as discussed in the body of this order.

By the Commission.

( S E A L )


                                                  Kimberly D. Bose,
                                                  Secretary.


--------

       [32] 40 C.F.R. § 1501.6 (2014).

       [33] DOE/FE Order Nos. 2833 (2010) and 2961 (2011).

       [34] Rehearing request at 8-9.

       [35] 2012 Rehearing Order, 140 FERC ¶ 61,076 at P 25 (citing CEQ *Draft Guidance on Consideration of the Effects of Climate Change and Greenhouse Gas Emissions* (February 18, 2010)).

Document Content(s)

CP14-12-001.DOCX......................................................1-9