**ORAL ARGUMENT NOT YET SCHEDULED**

No. 14-1249

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

———————————

SIERRA CLUB,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

———————————

Petition for Review of Orders
of the Federal Energy Regulatory Commission

———————————

**BRIEF FOR RESPONDENT-INTERVENORS
SABINE PASS LIQUEFACTION, LLC AND
SABINE PASS LNG, L.P.**

———————————

LISA M. TONERY
CHARLES R. SCOTT
NORTON ROSE FULBRIGHT US LLP
666 Fifth Avenue
New York, N.Y. 10103
(212) 318-3278

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
799 9th Street, N.W.
Washington, D.C. 20001
(202) 662-0466

Counsel for Sabine Pass Liquefaction,
LLC and Sabine Pass LNG, L.P.

August 13, 2015

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    PARTIES

All parties, intervenors, and amici appearing in this Court are listed in the Opening Brief of Petitioner Sierra Club.

### B.    RULINGS UNDER REVIEW

References to the rulings at issue appear in the Opening Brief of Petitioner Sierra Club.

### C.    RELATED CASES

The instant case has not previously been before this Court or any other court. Three related cases within the meaning of D.C. Cir. R. 28(a)(1)(C) are currently pending in this Court: *Sierra Club and Galveston Baykeeper v. Federal Energy Regulatory Commission*, No. 14-1275, will be scheduled for oral argument on the same date and before the same panel as the instant case; *EarthReports, Inc. (d/b/a Patuxent Riverkeeper) et al. v. Federal Energy Regulatory Commission*, No. 15-1127, was filed on May 7, 2015; and *Sierra Club v. Federal Energy Regulatory Commission*, No. 15-1133, was filed on May 11, 2015.

Respectfully submitted,

/s/ Jonathan S. Franklin

Lisa M. Tonery                          Jonathan S. Franklin
Charles R. Scott                        NORTON ROSE FULBRIGHT US LLP
NORTON ROSE FULBRIGHT US LLP 799 9th St., N.W.
666 Fifth Ave.                          Washington, D.C. 20001
New York, N.Y. 10103                    (202) 662-0466
(212) 318-3278                          jonathan.franklin@nortonrosefulbright.com

                                        Counsel for Sabine Pass Liquefaction, LLC
August 13, 2015                         and Sabine Pass LNG, L.P.

## CORPORATE DISCLOSURE STATEMENT

Both Sabine Pass Liquefaction, LLC, and Sabine Pass LNG, L.P. are indirect subsidiaries of Cheniere Energy Partners, L.P., a Delaware limited partnership.  Cheniere Energy Partners, L.P. is an indirect subsidiary of Cheniere Energy, Inc., a Delaware corporation that—both of its own accord and through Cheniere Energy Partners, L.P.—is a developer of liquefied natural gas terminals and natural gas pipelines on the Gulf Coast.

Cheniere Energy, Inc. indirectly owns 100% of the general partner interest in Cheniere Energy Partners, L.P. and 80.1% of Cheniere Energy Partners LP Holdings, LLC (NYSE MKT: CQH), which is a publicly-traded limited liability company that owns a 55.9% limited partner interest in Cheniere Energy Partners, L.P.

Sabine Pass Liquefaction, LLC is a Delaware limited liability company with a principal place of business in Houston, Texas.

Sabine Pass LNG, L.P. is a Delaware limited partnership with a principal place of business in Houston, Texas.

Cheniere Energy, Inc. (NYSE MKT: LNG) is a publicly-traded corporation that has no parent companies.  No publicly-held corporation has a 10% or greater ownership interest in Cheniere Energy, Inc.

Cheniere Energy Partners, L.P. (NYSE MKT: CQP) is a publicly-traded limited partnership that is also owned in part by Blackstone CQP Holdco LP.

The other direct and indirect subsidiaries of Cheniere Energy, Inc. that are parent companies of Sabine Pass Liquefaction, LLC and/or Sabine Pass LNG, L.P. are: Sabine Pass LNG-GP, LLC; Sabine Pass LNG-LP, LLC; Cheniere Energy Investments, LLC; Cheniere Energy Partners GP, LLC; Cheniere GP Holding Company, LLC; and Cheniere LNG Terminals, LLC.

Respectfully submitted,

/s/ Jonathan S. Franklin

| | |
|---|---|
| Lisa M. Tonery | Jonathan S. Franklin |
| Charles R. Scott | NORTON ROSE FULBRIGHT US LLP |
| NORTON ROSE FULBRIGHT US LLP | 799 9th St., N.W. |
| 666 Fifth Ave. | Washington, D.C. 20001 |
| New York, N.Y. 10103 | (202) 662-0466 |
| (212) 318-3278 | jonathan.franklin@nortonrosefulbright.com |
| | Counsel for Sabine Pass Liquefaction, LLC |
| August 13, 2015 | and Sabine Pass LNG, L.P. |

iv

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .................................................................................................i

CORPORATE DISCLOSURE STATEMENT ...................................... iii

TABLE OF CONTENTS.................................................................v

TABLE OF AUTHORITIES ......................................................... vii

GLOSSARY.............................................................................. xii

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF THE ISSUE.........................................................1

STATUTES AND REGULATIONS...................................................2

STATEMENT OF THE CASE..........................................................2

    A.    STATUTORY AND REGULATORY BACKGROUND ..................................................................2

        1.    Jurisdiction Under The Natural Gas Act. ........................2

        2.    Environmental Review Under NEPA..............................4

    B.    FACTUAL BACKGROUND...................................................5

        1.    The Sabine Pass Liquefaction Project. ............................5

        2.    The Amendment. .......................................................7

        3.    DOE Proceedings. .........................................................9

SUMMARY OF ARGUMENT .......................................................13

STANDARD OF REVIEW ...........................................................15

ARGUMENT ...........................................................................15

    I.    FERC'S REASONABLE DETERMINATION IS ENTITLED TO SUBSTANTIAL DEFERENCE.............................15

    II.    FERC'S NEPA DETERMINATION WAS NOT ARBITRARY OR CAPRICIOUS. ......................................16

        A.    Sierra Club Misinterprets The Standard For Cognizable "Indirect Effects" Under NEPA. ...........................16

B.  FERC Justifiably Explained That The Putative Impacts Alleged By Sierra Club Are Not Reasonably Foreseeable....................................................22

1.  FERC Properly Determined That Sierra Club's Reliance On The EIA Study Was Misplaced....................................................24

2.  FERC Properly Determined That The Impacts Alleged By Sierra Club Are Overly Speculative....................................................28

C.  The Impacts Alleged By Sierra Club Are Insufficiently Causally Connected To The Amendment To Qualify As Indirect Effects............................31

II.  FERC WAS NOT REQUIRED TO CONSIDER THE CUMULATIVE IMPACTS OF INCREASED NATURAL GAS PRODUCTION THEORETICALLY ATTRIBUTABLE TO ALL PENDING LNG EXPORT PROPOSALS. ....................................................36

CONCLUSION ....................................................38

CERTIFICATE OF COMPLIANCE....................................................39

CERTIFICATE OF SERVICE ....................................................40

ADDENDUM OF STATUTES AND REGULATIONS

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Airlines for Am. v. Transp. Sec. Admin.*, 780 F.3d 409 (D.C. Cir. 2005) ................................................................................16

*Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527 (2011) ...........................30

*Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124 (9th Cir. 2011) ......................30

*Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183 (D.C. Cir. 2013) ................................................................18

*Border Power Plant Working Group v. Dep't of Energy*, 260 F. Supp. 2d 997 (S.D. Cal. 2003) ...........................................................17, 23

*City of Dallas v. Hall*, 562 F.3d 712 (5th Cir. 2009) ...................................22, 34

*City of Shoreacres v. Waterworth*, 420 F.3d 440 (5th Cir. 2005) ..........22, 34, 37

*Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215 (5th Cir. 2006) ................................................................................17, 24

*Del. Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 753 F.3d 1304 (D.C. Cir. 2014) ................................................................36

* *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) ...............15, 17, 32, 33, 34, 35

*Diné Citizens Against Ruining the Env't v. U.S. Office of Surface Min., Reclamation & Enforcement*, ___ F. Supp. 3d ___, 2015 WL 996605 (D. Colo. Mar. 2, 2015) ..........................................................23

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59 (1978) ..................................................................................17

*ExxonMobil Gas Mktg. Co. v. Fed. Energy Regulatory Comm'n*, 297 F.3d 1071 (D.C. Cir. 2002) ................................................................2

*Authorities upon which we chiefly rely are marked with asterisks.

vii

*Fla. Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008) .............................35

*Found. on Econ. Trends v. Lyng*, 817 F.2d 882 (D.C. Cir. 1987) .................5, 19

*Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339 (D.C. Cir. 2002) ....................................................................................................37

*Grunewald v. Jarvis*, 776 F.3d 893 (D.C. Cir. 2015) ......................................4, 5

*High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174 (D. Colo. 2014) ..................................................................23

*Jackson County, N.C. v. Fed. Energy Regulatory Comm'n*, 589 F.3d 1284 (D.C. Cir. 2009) ..............................................................................4

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698 (6th Cir. 2014) .......................................................................34

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ....................................................15

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ....................................................31

*Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983) ..........................................................................................32, 33

*Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520 (8th Cir. 2003) .......................................................................................28, 29

*Myersville Citizens for a Rural Cmty. v. Fed. Energy Regulatory Comm'n*, 783 F.3d 1301 (D.C. Cir. 2015) ...................................................18

*Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994) .......................20

*Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972) ..............................................................................................................15

*N.J. Dep't of Envtl. Prot. v. U.S. Nuclear Regulatory Comm'n*, 561 F.3d 132 (3d Cir. 2009) .............................................................................34

*New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471 (D.C. Cir. 2012) ..............................................................................................17, 18, 29

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ...............................................................................................23

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015).......................................2, 33

*Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895 (D.C. Cir. 2002)..................16

*Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497 (D.C. Cir. 2010) .................................................................................37

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978)............................................................................4

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013)......................38

*WildEarth Guardians v. U.S. Office of Surface Min., Reclamation & Enforcement*, ___ F. Supp. 3d ___, 2015 WL 2207834 (D. Colo. May 8, 2015) ...................................................................23

**STATUTES:**

15 U.S.C. § 717.......................................................................................33

15 U.S.C. § 717b.................................................................................2, 3

15 U.S.C. § 717n......................................................................................4

15 U.S.C. § 717r...................................................................................1, 36

42 U.S.C. § 4331....................................................................................19

42 U.S.C. § 4332.................................................................................4, 32

42 U.S.C. § 7172......................................................................................3

Pub. L. No. 75-688, 52 Stat. 821, 822 (1938) .........................................2

Pub. L. No. 95-91, § 402(f), 91 Stat. 565, 585 (1977) ............................3

**ADMINISTRATIVE MATERIALS:**

10 C.F.R. Part 1021, Subpart D, App. B5.7 (2015).................................4

40 C.F.R. § 1502.16 (2014) .....................................................................5

40 C.F.R. § 1508.7 (2014) ............................................................5, 36, 37

* 40 C.F.R. § 1508.8 (2014) ...........................................................5, 15, 32

40 C.F.R. § 1508.25 (2014) ...................................................................5

43 Fed. Reg. 47,769 (Oct. 17, 1978) ......................................................3

49 Fed. Reg. 6684 (Feb. 22, 1984) .........................................................3

77 Fed. Reg. 49,490 (Aug. 16, 2012) ...................................................33

77 Fed. Reg. 73,627 (Dec. 11, 2012).....................................10, 12, 25

79 Fed. Reg. 1430 (Jan. 8, 2014) ...................................................20, 33

* 79 Fed. Reg. 32,258 (June 4, 2014)...............................13, 27, 28, 38

79 Fed. Reg. 34,830 (June 18, 2014) ...................................................33

79 Fed. Reg. 34,960 (June 18, 2014) ...................................................34

79 Fed. Reg. 48,132 (Aug. 15, 2014) ....................................12, 13, 27

79 Fed. Reg. 65,482 (Nov. 4, 2014) .....................................................34

79 Fed. Reg. 77,802 (Dec. 24, 2014).....................................................31

*Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 2833 (2010) ......................9

*Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 2961-A (2012) ................9

*Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 3306 (2013) ......................9

*Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 3307 (2013) ....................10

*Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 3384 (2013) ....................10

*Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 3595 (2015) ......................9

*Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 3669 (2015) ....................10

* *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, 139
   FERC ¶ 61,039 (2012)................................................6, 16, 21, 22,
                                                                             26, 27

* *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, 140
   FERC ¶ 61,076 (2012)................................................6, 16, 22, 24,
                                                                             28, 29, 32

x

\* *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, 146 FERC ¶ 61,117 (2014)....................................................6, 7, 9, 16, 22, 31, 33, 37

\* *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, 148 FERC ¶ 61,200 (2014)...........................................16, 22, 24, 32, 28

U.S. Dep't of Energy, Delegation Order No. 00-004.00A (May 16, 2006) ...............................................................................3

U.S. Dep't of Energy, Delegation Order No. 00-006.02 (Nov. 17, 2014).................................................................................3

*Yukon Pac. Corp.*, DOE/FE Order No. 350, 1 FE ¶ 70,259 (1989) ..................10

# GLOSSARY

2012 Authorizing Order ....................... *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, 139 FERC ¶ 61,039 (2012)

2012 Rehearing Order ......................... *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, 140 FERC ¶ 61,076 (2012)

Amending Order ............................... *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, 146 FERC ¶ 61,117 (2014)

Amendment ...................................... Increased authorized maximum peak day liquefied natural gas production capacity for Sabine Pass Liquefaction Project, FERC Docket No. CP14-12-000

Amendment Application ..................... Application of Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P. for Limited Amendment to Authorization Granted Under Section 3 of the Natural Gas Act, *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, FERC Docket No. CP14-12-000 (Oct. 25, 2013)

DOE.................................................. U.S. Department of Energy

EA .................................................... Environmental Assessment

EIA .................................................. U.S. Energy Information Administration

EIA Study.......................................... U.S. Energy Info. Admin., *Effect of Increased Natural Gas Exports on Domestic Energy Markets* (2012)

EIS.................................................... Environmental Impact Statement

Environmental Addendum .................. U.S. Dep't of Energy, *Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States* (2014)

EPA .................................................... U.S. Environmental Protection Agency

Export Study ...................................... U.S. Dep't of Energy, *LNG Export Study* (2012)

FERC .................................................. Federal Energy Regulatory Commission

Intervention Motion ........................... Sierra Club's Motion to Intervene, Protest, and Comments, *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, FERC Docket No. CP14-12-000 (Nov. 11, 2013)

JA ....................................................... Joint Appendix

Liquefaction Project............................ Sabine Pass Liquefaction Project, FERC Docket No. CP11-72-000

LNG.................................................... liquefied natural gas

NEPA ................................................. National Environmental Policy Act

NGA ................................................... Natural Gas Act

Rehearing Order................................. *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, 148 FERC ¶ 61,200 (2014)

Rehearing Request ............................. Motion for Rehearing, *Sabine Pass Liquefaction, LLC & Sabine Pass LNG, L.P.*, FERC Docket No. CP14-12-001 (Mar. 24, 2014)

Sabine Pass........................................ Respondent-Intervenors Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.

Terminal ............................................. Sabine Pass Liquefied Natural Gas Terminal

IN THE
# United States Court of Appeals
# for the District of Columbia Circuit

———————————

No. 14-1249

———————————

SIERRA CLUB,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

———————————

Petition for Review of Orders
of the Federal Energy Regulatory Commission

———————————

**BRIEF FOR RESPONDENT-INTERVENORS
SABINE PASS LIQUEFACTION, LLC AND
SABINE PASS LNG, L.P.**

———————————

## JURISDICTIONAL STATEMENT

The petition for review alleges jurisdiction under Section 19(b) of the

Natural Gas Act ("NGA"), 15 U.S.C. § 717r(b).  Respondent ("FERC") contends

the Court lacks jurisdiction.  This brief addresses Petitioner's ("Sierra Club's")

arguments on the merits assuming *arguendo* that jurisdiction exists.

## STATEMENT OF THE ISSUE

Whether it was arbitrary or capricious for FERC to determine that alleged

impacts of emissions from increased natural gas production and coal consumption

did not require analysis under the National Environmental Policy Act ("NEPA"), both because such alleged impacts are too speculative to be reasonably foreseeable, and because they are insufficiently causally connected to the authorization at issue.

## STATUTES AND REGULATIONS

Except for those in the Addendum, applicable statutes and regulations are contained in the Brief for Petitioner and the Brief for Respondent FERC.

## STATEMENT OF THE CASE

### A.     STATUTORY AND REGULATORY BACKGROUND.

#### 1.     Jurisdiction Under The Natural Gas Act.

NGA Section 3 prohibits any person from "export[ing] any natural gas from the United States to a foreign country … without first having secured an order of the [Federal Power] Commission authorizing it to do so."  Pub. L. No. 75-688, § 3, 52 Stat. 821, 822 (1938) (codified as amended at 15 U.S.C. § 717b(a)).  The statute confers no authority over the production of natural gas.  *See Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1596 (2015) ("The Act leaves regulation of other portions of the industry—such as production, local distribution facilities, and direct sales—to the States."); *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1076 (D.C. Cir. 2002) ("Congress … 'did not envisage federal regulation of the entire natural-gas field to the limit of constitutional power.'") (citation omitted).

In 1977, Congress transferred authority over exports under NGA Section 3 to the Secretary of Energy. *See* Pub. L. No. 95-91, § 402(f), 91 Stat. 565, 585 (1977) (codified at 42 U.S.C. § 7172(f)). Since 1978, the Secretary has delegated to FERC the authority to "[a]pprove or disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry of imports or exit for exports." DOE, Delegation Order No. 00-004.00A, § 1.21.A (May 16, 2006); *see also* 43 Fed. Reg. 47,769, 47,772 (Oct. 17, 1978). But the policy determination whether export of natural gas would be consistent with the "public interest" remains DOE's purview. *See* 49 Fed. Reg. 6684, 6688 (Feb. 22, 1984); *see also* DOE, Delegation Order No. 00-006.02, § 1.3.A (Nov. 17 2014). DOE lacks discretion to deny applications to export natural gas to nations "with which there is in effect a free trade agreement requiring national treatment for trade in natural gas," as such applications "***shall*** be granted without modification or delay." 15 U.S.C. § 717b(c) (2012) (emphasis added). DOE "may" grant applications to export natural gas to other nations, "with such modification and upon such terms and conditions as [it] may find necessary and appropriate." *Id.* § 717b(a).

3

## 2.    Environmental Review Under NEPA.

The NGA designates FERC "as the lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with [NEPA]" for Section 3 applications.  *Id.* § 717n(b)(1).[1]

NEPA requires a federal agency, before undertaking a "major Federal action[] significantly affecting the quality of the human environment," to prepare a statement on the environmental impact of the proposed action.  42 U.S.C. § 4332(2)(C)(i) (2012).  NEPA can be satisfied through preparation of an environmental impact statement ("EIS") or—where the agency determines that there will be no significant impact—an environmental assessment ("EA").  *See Jackson County, N.C. v. FERC*, 589 F.3d 1284, 1287 n.2 (D.C. Cir. 2009).  "NEPA's mandate 'is essentially procedural.'"  *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).  It requires agencies to take a "hard look" at the environmental consequences of proposed actions, but does not mandate particular results.  *See id.*  Thus, "NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency, as 'NEPA was not

---

[1] DOE typically participates as a NEPA cooperating agency, but its regulations provide that authorizations for natural gas exports based on operational changes—rather than new construction—are categorically excluded from NEPA.  *See* 10 C.F.R. Part 1021, Subpart D, App. B5.7 (2015).

intended to resolve fundamental policy disputes.'" *Id.* (quoting *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987)).

Under the Council on Environmental Quality's implementing regulations, an agency's NEPA analysis should discuss both the proposed action's "[d]irect effects" and its "[i]ndirect effects." 40 C.F.R. § 1502.16 (2014). "Direct effects" are "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). "Indirect effects" are "caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." *Id.* § 1508.8(b). Similarly, in determining the scope of its NEPA environmental analysis, an agency must consider the proposed action's "cumulative" impact, which is "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* §§ 1508.25(c), 1508.7.

## B.     FACTUAL BACKGROUND.

### 1.     The Sabine Pass Liquefaction Project.

Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P. (together, "Sabine Pass") are constructing Stages 1 and 2 of the Sabine Pass Liquefaction Project ("Liquefaction Project"), consisting of four natural gas liquefaction "trains" at the Sabine Pass LNG Terminal ("Terminal") in Cameron Parish, Louisiana. Sabine Pass initially obtained FERC authorization to operate the Terminal as an LNG import facility in 2004, but in January 2011 sought authorization for the

5

Liquefaction Project—which adds export capability, making the Terminal bidirectional—due to changed market conditions.  *See* JA___–___ [2012 Authorizing Order ¶¶ 1–4]; *see also* FERC Br. 11–14 (detailing history of Liquefaction Project).

FERC issued an EA for the Liquefaction Project in December 2011, and an order authorizing it under NGA Section 3 in April 2012.  *See* JA___ [2012 Authorizing Order ¶ 21].  In January 2012, Sierra Club moved to intervene in the FERC proceeding (nearly eleven months late), and submitted comments on the EA, arguing, *inter alia*, that NEPA required FERC to consider the impacts of natural gas production and resulting air emissions that the Liquefaction Project would allegedly induce.  *See* JA___ [*id.* ¶ 94].  FERC rejected Sierra Club's arguments in the 2012 Authorizing Order, *see* JA___–___ [*id.* ¶¶ 95–99], of which Sierra Club sought rehearing, *see* JA ___ [2012 Reh'g Order ¶ 1].  FERC denied rehearing in July 2012, again rejecting Sierra Club's NEPA arguments.  *See* JA___–___ [*Id.* ¶¶ 8–28].  Sierra Club, however, did not seek judicial review of either 2012 order. Sabine Pass expects to put Stages 1 and 2 of the Liquefaction Project into service in early 2016 and 2017, respectively.

During the final design process for the Liquefaction Project, Sabine Pass received FERC authorization to make design changes that increased the Liquefaction Project's potential capacity.  *See* JA___–___ [Amending Order ¶¶ 4–

6

5]. Specifically, design optimizations for turbines, compressors, and piping to enable them to operate more efficiently were authorized through a June 2013 FERC letter order of which Sierra Club did not seek rehearing. *See* JA___–___ [*Id.* ¶ 4]; JA___ [Amendment Application at 6]. Sabine Pass later received—in August 2013—authorization to make other modifications to the Liquefaction Project, including to construct Stages 1 and 2 simultaneously rather than sequentially. *See* JA___ [Amending Order ¶ 3 n.6]. Again, Sierra Club did not seek rehearing.

Additionally, Sabine Pass submitted an application to FERC in September 2013 seeking FERC authorization to site, construct, and operate the Sabine Pass Liquefaction Expansion Project, consisting of two more natural gas liquefaction trains at the Terminal. *See* JA___ [*Id.* ¶ 3 n.7]. FERC issued an order authorizing the project in April 2015, and denied Sierra Club's request for rehearing thereof in July 2015.

## 2. The Amendment.

In its January 2011 FERC application, Sabine Pass had requested authorization to liquefy and export up to 2.2 billion cubic feet of natural gas per day from Stages 1 and 2 of the Liquefaction Project, a "nameplate capacity" based on conservative estimates of the expected average annual output of each of the four liquefaction trains over its anticipated lifetime. *See* JA___ [Amendment

7

Application at 4]. But based upon design modifications FERC had already approved (and of which Sierra Club had not sought review), as well as more optimistic assumptions regarding optimal operating conditions and reduced maintenance downtime, Sabine Pass subsequently determined that, as ultimately constructed, Stages 1 and 2 theoretically have a peak maximum daily liquefaction capacity of 2.76 billion cubic feet of natural gas. *See* JA___ [*id.* at 4–5].

Accordingly, in October 2013 Sabine Pass submitted an application to FERC, requesting an amendment ("Amendment") to the Liquefaction Project's authorization increasing its authorized production capacity. Sabine Pass explained that this theoretical increased capacity relied on "optimal operating conditions (*i.e.*, cooler ambient temperatures and the implementation of enhanced operations and maintenance processes that promote production efficiencies)," and would require "no additional construction." JA___, ___ [*id.* at 7, 5]. It represented that air emissions from the Liquefaction Project would be within levels to be permitted by the Louisiana Department of Environmental Quality. JA___ [*id.* at 5 n.9].

Sierra Club moved to intervene in the FERC Amendment proceeding, again arguing that NEPA required FERC to discuss the impacts of emissions from increased natural gas production and coal consumption allegedly induced by the Amendment. *See* JA___–___ [Intervention Mot. at 14–19]. FERC issued an EA for the Amendment in January 2014, and an Amending Order in February 2014.

8

Citing the 2012 Authorizing Order, of which Sierra Club had not sought judicial review, FERC reiterated that the putative impacts alleged by Sierra Club were not cognizable under NEPA. *See* JA___–___ [Amending Order ¶¶ 14–16]. In denying Sierra Club's request for rehearing in September 2014, FERC again explained the impacts posited by Sierra Club were not reasonably foreseeable, and would be affected by factors over which FERC lacked authority. The instant petition for review followed; it challenges only the Amending Order and Rehearing Order, and not any other FERC order associated with the Liquefaction Project.

### 3.    DOE Proceedings.

Sabine Pass Liquefaction, LLC obtained DOE orders authorizing export of LNG from the Liquefaction Project up to the equivalent of 803 billion cubic feet per year to free-trade nations and non-free-trade nations in 2010 and 2012, respectively.[2] As to the additional capacity from Stages 1 and 2 of the Liquefaction Project, DOE granted export authorization for free-trade nations in February 2015.[3] Sabine Pass Liquefaction, LLC's application for authorization to export to non-free-trade nations is still pending.[4]

---

[2] *Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 2833 (2010); *Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 2961-A (2012).

[3] *Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 3595 (2015).

[4] DOE has also issued orders authorizing exports from the Sabine Pass Liquefaction Expansion Project. *See Sabine Pass Liquefaction, LLC*, DOE/FE

Sierra Club's brief relies extensively on a 2012 study conducted by the U.S. Energy Information Administration ("EIA"), *Effect of Increased Natural Gas Exports on Domestic Energy Markets* ("EIA Study"), the first part of a two-part "Export Study" commissioned by DOE to inform its "continuing duty to monitor supply and demand conditions in the United States in order to ensure that authorizations to export LNG do not subsequently lead to a reduction in the supply of natural gas needed to meet essential domestic needs."  77 Fed. Reg. 73,627, 73,628 (Dec. 11, 2012); *cf. Yukon Pac. Corp.*, DOE/FE Order No. 350, 1 FE ¶ 70,259, at 71,128 (1989) (stating "domestic need for the natural gas proposed to be exported [is] the only explicit criterion that must be considered" in DOE's policy determination).

The EIA Study was designed to examine possible implications of additional natural gas exports on domestic energy markets under various specified hypothetical scenarios, which the agency cautioned "were not forecasts of either the ultimate level, or rates of increase, of exports."  77 Fed. Reg. at 73,628.  The study's projections were "not statements of what *will* happen but of what *might* happen, given the assumptions and methodologies used."  JA___ [EIA Study at ii];

---

Order No. 3306 (2013); *Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 3307 (2013); *Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 3384 (2013); *Sabine Pass Liquefaction, LLC*, DOE/FE Order No. 3669 (2015).  Sierra Club has sought rehearing of the most recent order.

*see also* JA___ (listing scenarios agency had been instructed to consider) [*id.* at 1]. The study generally found that, "[u]nder the scenarios specified … increased natural gas exports lead to higher domestic natural gas prices, which lead to reduced domestic consumption, and increased domestic production…." JA___ [*Id.* at 10].

But the agency cautioned that "projections of energy markets over a 25-year period are highly uncertain and subject to many events that cannot be foreseen." JA___ [*Id.* at 3]. It noted that "[t]his is particularly true in projecting the effects of exporting significant natural gas volumes" due to various factors, including that (1) the modeling on which the study had relied "is not a world energy model and does not address the interaction between the potential for additional U.S. natural gas exports and developments in world natural gas markets;" (2) the nature of global natural gas markets "could change substantially;" (3) the modeling did not include "[m]acroeconomic results;" and (4) the modeling "does not account for the impact of energy price changes on the global utilization pattern for existing capacity or the siting of new capacity inside or outside of the United States in energy-intensive industries." JA___ [*Id.*].[5]

---

[5] Similarly, the EIA's *Annual Energy Outlook 2013* projected varying levels of natural gas exports depending on macroeconomic scenarios, and explained that "future U.S. exports of LNG depend on a number of factors that are difficult to anticipate, including the speed and extent of price convergence in global natural

The second part of DOE's Export Study analyzed the "macroeconomic impact of LNG exports on the U.S. economy" under a range of scenarios. 77 Fed. Reg. at 73,628. It was designed to complement the EIA Study, which had projected theoretical export-related price increases "without, for example, considering whether or not those quantities of exports could be sold at high enough world prices to support the calculated domestic prices." JA___ [Intervention Mot., Ex. 3 at 3]. The second part found that "the U.S. was projected to gain net economic benefits from allowing LNG exports," but also that the highest export-level scenarios—and corresponding prices—considered by the EIA were "not likely." JA___, ___ [*Id.* at 1, 9]. It, too, acknowledged "great uncertainties about how the U.S. natural gas market will evolve." JA___ [*Id.* at 21].

More recently, during the pendency of Sierra Club's request for rehearing of the Amending Order, DOE issued an *Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States* ("Environmental Addendum") that briefly summarized unconventional natural gas production activities, and discussed their potential environmental impacts based on a review of existing literature, regulations, and best management practices. 79

---

gas markets, the extent to which natural gas competes with oil in domestic and international markets, and the pace of natural gas supply growth outside the United States." EIA, *Annual Energy Outlook 2013* at 161, 79 (Apr. 2013) (www.eia.gov/forecasts/aeo/pdf/0383(2013).pdf); *see also id.* at 3 ("The prospects for exports are highly uncertain … depending on many factors that are difficult to gauge….").

Fed. Reg. 48,132, 48,132 (Aug. 15, 2014). DOE emphasized that the

Environmental Addendum was "not required by … NEPA," *id.*, agreeing with

FERC that "environmental impacts resulting from production activity induced by

LNG exports … are not 'reasonably foreseeable,'" 79 Fed. Reg. 32,258, 32,259

(June 4, 2014).

## SUMMARY OF ARGUMENT

FERC reasonably explained that, under NEPA, theoretical impacts of

emissions from increased natural gas production (and coal consumption) are

neither "indirect effects" nor "cumulative impacts" of its authorization of

additional capacity for the Liquefaction Project, because they are not reasonably

foreseeable and are too tenuously connected to that authorization. FERC

reasonably concluded that its decision would not meaningfully be informed by the

speculative prospect of unknown amounts and types of emissions, in unknown

locations throughout the world, that may or may not occur over the next quarter-

century due to myriad economic, regulatory and technological developments that

are unrelated to the additional capacity authorization, and are subject to control by

other federal, state and local agencies, and foreign sovereigns.

Unable to show that such impacts are indirect effects of the Amendment—

which entails no new facilities—Sierra Club variously argues that NEPA required

FERC to: consider any theoretical environmental impact derived from general

economic principles; address any conceivable effect with a nonzero chance of occurring; and limit emissions associated with the Amendment to prevent interference with other governmental initiatives. These arguments cannot be reconciled with NEPA's reasonable foreseeability standard, or with the fact that its requirements are procedural, not substantive.

FERC's determination that emissions impacts from gas production and coal consumption fell outside the scope of the Amendment's EA was entitled to substantial deference, and was consistent with precedent. Such impacts require too much speculation to be reasonably foreseeable, given that natural gas production may increase or decrease for reasons unrelated to the Amendment, which does not depend on additional production. The EIA Study upon which Sierra Club relies did not make specific predictions regarding gas production, let alone LNG export levels. And, even assuming that additional production were reasonably foresee-able, FERC and DOE are in agreement that its environmental impacts are not.

Furthermore, FERC reasonably explained that the impacts Sierra Club alleges are insufficiently causally connected to the Amendment to be "indirect effects." FERC lacks authority over natural gas production, which is regulated by the states. Moreover, the very impacts with which Sierra Club is concerned—emissions from natural gas production and coal-fired power plants—are regulated by the U.S. Environmental Protection Agency ("EPA"). Applying NEPA's rule of

14

reason, FERC need not speculate on these emissions, over which it lacks authority, as such speculation would not yield meaningful information.

Finally, Sierra Club's argument that FERC improperly ignored the cumulative impact of all proposed LNG facilities has been waived, but in any event fails because it, too, is aimed at non-cognizable effects.

## STANDARD OF REVIEW

Sabine Pass agrees with the Standard of Review set forth by FERC.  *See* FERC Br. 21–22.

## ARGUMENT

## I.    FERC'S REASONABLE DETERMINATION IS ENTITLED TO SUBSTANTIAL DEFERENCE.

To be cognizable as "indirect effects" under NEPA, impacts must be both "reasonably foreseeable" and "caused" by the action under review.  40 C.F.R. § 1508.8(b).  Agency decisions regarding the proper scope of their NEPA analyses are reviewed deferentially, *see Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976), applying a "rule of reason" that is "based on the usefulness of any new potential information to the decisionmaking process" and does not require analyses that would "serve no purpose," *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004); *see also Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 837 (D.C. Cir. 1972) ("The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible….").

15

FERC has reasonably, and repeatedly, explained that the environmental impacts alleged by Sierra Club do not constitute cognizable indirect effects under NEPA, both because they are too speculative to be reasonably foreseeable, and because they are insufficiently causally connected to the authorization of additional capacity for the Liquefaction Project.  *See* JA___ – ___ [Amending Order ¶¶ 14– 15]; JA___ – ___ [Reh'g Order ¶¶ 12–13]; JA___ – ___ [2012 Authorizing Order ¶¶ 94–99]; JA___ – ___ [2012 Reh'g Order ¶ 8–22].  Sierra Club's arguments to the contrary misinterpret the applicable standards under NEPA, and are unpersuasive when weighed against the proper standards.

## II.     FERC'S NEPA DETERMINATION WAS NOT ARBITRARY OR CAPRICIOUS.

### A.     Sierra Club Misinterprets The Standard For Cognizable "Indirect Effects" Under NEPA.

Sierra Club seeks to circumvent FERC's reasoning by misinterpreting the applicable NEPA standards in four respects.  First, Sierra Club relies on case law addressing Article III standing to argue that any theoretical consequence to the environment derived from "'generally applicable' economics" is necessarily an effect needing consideration under NEPA.  *See* Sierra Club Br. 40–41.  But the line of cases Sierra Club cites did not involve NEPA at all, let alone the definition of "indirect effects."  *See Airlines for Am. v. TSA*, 780 F.3d 409 (D.C. Cir. 2005); *Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002); *see also* FERC Br. 41.  This is

16

a crucial distinction, because while a "but for" causal relationship is sufficient to establish the causation element of Article III standing, *see*, *e.g.*, *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 74–75 (1978), it is "***insufficient*** to make an agency responsible for a particular effect under NEPA and the relevant regulations," *Pub. Citizen*, 541 U.S. at 767 (emphasis added); *see infra* at 32. Thus, courts addressing NEPA "indirect effects" have not allowed plaintiffs to rely only on general economic principles, as Sierra Club would do here.  *See*, *e.g.*, *Border Power Plant Working Grp. v. DOE*, 260 F. Supp. 2d 997, 1028 (S.D. Cal. 2003) (rejecting argument that agency was required to consider impacts of emissions from power plant expansion that was a "speculative possibility, dependent on the market for electricity"); *see also Coliseum Sq. Ass'n, Inc. v. Jackson*, 465 F.3d 215, 238 (5th Cir. 2006) (rejecting reliance on "broad statistical data discussing general national trends" to show cognizable effects).

Second, Sierra Club attempts to read reasonable foreseeability out of NEPA by citing *New York v. Nuclear Regulatory Commission*, 681 F.3d 471, 482 (D.C. Cir. 2012), for the proposition that an agency must discuss any potential effect with a "nonzero" probability of occurring.  Sierra Club Br. 47.  The cited discussion, however, did not concern the definition of "indirect effects"—*i.e.*, whether a given indirect consequence to the environment is a reasonably foreseeable "effect" under NEPA at all—but rather whether an acknowledged potential effect was

17

"significant" so as to require discussion in an EIS rather than an EA.  *See New York*, 681 F.3d at 479–83; *cf. Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (reviewing agency's decision that no EIS is required).

*New York* held that the Nuclear Regulatory Commission's EA for a rulemaking on storage of spent nuclear fuel had failed to show that the risk of fires—a potential effect identified by the agency itself—was so low, or the consequence of fires so minimal, as to be "insignificant" and to necessitate no EIS. *See* 681 F.3d at 481–82; *see also id.* at 475 (noting "potential environmental effects" identified by agency).  The Court held that where there is some probability that fires might occur, the agency also needed to consider the consequences of such fires before deciding not to prepare an EIS based on a finding of no significant impact.  *Id.* at 482.  Thus, there was no discussion of whether the risk of fires was reasonably foreseeable, only of whether it had been shown to be insignificant.  *See also* FERC Br. 34–35.  Indeed, the Court held that "the finding that the probability of a given harm is nonzero does not, by itself, mandate an EIS." *New York*, 681 F.3d at 482.  *New York* could not and did not amend the regulatory definition of "indirect effects," which requires reasonable foreseeability, not just a nonzero probability.  *Cf. Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 188 (D.C. Cir. 2013) ("The EIS must address all reasonably

foreseeable environmental impacts, including reactor accidents, even if the probability of such an occurrence is low.").  For a given project, there may be a virtually infinite number of effects that have a nonzero probability of occurring, but only a small number of them will be reasonably foreseeable.

Third, Sierra Club suggests that the Amendment contravenes NEPA in that it "threaten[s] to undercut" regulation of greenhouse gas emissions being undertaken by EPA and the President.  Sierra Club Br. 44; *see also id.* at 28–30.  As an initial matter, this argument represents a tacit acknowledgment that the environmental effects about which Sierra Club complains—impacts of emissions from natural gas production and coal-fired electricity generation—are increasingly being regulated by a different agency.  As explained below, EPA regulation of these emissions, over which FERC has no authority, weakens the causal chain between a FERC authorization order and the emissions' impacts, confirming that they are not cognizable for purposes of FERC's NEPA analyses.  *See infra* at 33–34.  Furthermore, the suggestion that NEPA requires FERC to limit LNG export facility authorizations—and thereby, under Sierra Club's theory, emissions—is contrary to the well-settled principle that NEPA is a procedural statute that "was not intended to resolve fundamental policy disputes."  *Lyng*, 817 F.2d at 886.  Sierra Club bases its argument on the fact that NEPA's prefatory policy declaration mentions "coordinat[ing] Federal … programs."  42 U.S.C. § 4331(b) (2012); *see*

Sierra Club Br. 44.  But a prefatory statement like this would make a "rather thin reed upon which to base a requirement," *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260 (1994), that FERC must limit export facility authorizations.

In any event, the Amendment will not undercut either EPA regulation or the President's *Climate Action Plan*.  Sierra Club speculates that LNG exports could raise the price of natural gas, thereby compromising EPA's goal of encouraging utilities to rely on gas rather than coal for electricity generation.  *See* Sierra Club Br. 29, 31.  But EPA's proposed new source performance standards for fossil fuel-fired electric utility generating units (standards that impose specific emissions limits, and do not rely on market forces alone) already take natural gas exports into account; and EPA specifically contemplated the possibility of higher natural gas prices.  *See* 79 Fed. Reg. 1430, 1434, 1442 (Jan. 8, 2014) (discussing how proposed standards account for higher gas prices, and citing modeling from EIA's *Annual Energy Outlook 2013*).[6]  The *Climate Action Plan*, meanwhile, implicitly **supports** U.S. natural gas exports because of the possibility they might contribute to reducing global greenhouse gas emissions.  It notes that the United States has "become the world's leading producer of natural gas," explains that "[b]urning natural gas is about one-half as carbon-intensive as coal, which can make it a

---

[6] *See also supra* at 11 n.5 (noting *Annual Energy Outlook 2013*'s acknowledgment of uncertainty concerning LNG exports).

critical 'bridge fuel' for many countries as the world transitions to even cleaner

sources of energy," and states the Administration's intentions to "promote fuel-

switching from coal to gas for electricity production and encourage the

development of a global market for gas."  Executive Office of the President, *The*

*President's Climate Action Plan* 4, 19 (June 2013) (www.whitehouse.gov/sites/

default/files/image/president27sclimateactionplan.pdf).

Fourth, Sierra Club incorrectly argues that FERC, the lead NEPA agency,

has improperly shifted responsibility for analyzing the economic impacts of natural

gas production to DOE.[7]  FERC considered certain economic impacts in its 2011

EA for the Liquefaction Project, but also explained that impacts associated with

natural gas production are not cognizable under NEPA.  *See* JA___, ___ [2012

Authorizing Order ¶¶ 37, 96].  DOE, not FERC, has been assigned the task of

determining whether export of natural gas is consistent with the public interest, and

has commissioned broad projections in furtherance of that role.  *See supra* at 3,

10–11.  Those broad projections, however, do not transform general economic

considerations into effects cognizable under NEPA.

---

[7] DOE was not a cooperating agency here.  *See* FERC Br. 17–19; *see also supra* at 4 n.1.

**B.    FERC Justifiably Explained That The Putative Impacts Alleged By Sierra Club Are Not Reasonably Foreseeable.**

Sierra Club contends that NEPA required FERC to discuss the impacts of emissions from increased natural gas production and coal consumption allegedly induced by the Amendment.  Sierra Club Br. 40–42; *see also id.* at 16–18.  But FERC appropriately found such impacts not to be reasonably foreseeable.  *See* JA___–___ [Amending Order ¶¶ 14–15]; JA___–___ [Reh'g Order ¶¶ 12–13]; JA___–___ [2012 Authorizing Order ¶¶ 94–99]; JA___–___ [2012 Reh'g Order ¶¶ 8–22].

As FERC noted, "[a]n impact is 'reasonably foreseeable' if it is 'sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.'"  JA___ [2012 Authorizing Order ¶ 95] (quoting *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005)).  But agencies need not engage in speculative analyses of potential indirect effects.  *See*, *e.g.*, *City of Dallas v. Hall*, 562 F.3d 712, 719–20 (5th Cir. 2009) (EA for wildlife refuge—precluding property's use as reservoir—was not required to consider putative indirect effects on city's growth-induced future water needs, because such analysis would have entailed excessive speculation on whether reservoir would be constructed and what its role would be); *Waterworth*, 420 F.3d at 453 (agency approving ship terminal construction was not required to consider effect in form of deepening channel to accommodate ship traffic induced by terminal, because

22

prospect of deepening was speculative); *Border Power Plant Working Grp.*, 260 F. Supp. 2d at 1027, 1028 (EA for electric transmission lines was not required to consider effect in form of subsequent increase in power plant emissions, because power plant expansion was "a speculative possibility, dependent on the market for electricity and other factors," and because the record yielded "nothing to show that the specific operating details of [power] plants are reasonably foreseeable"). Rather, there must be specific, particularized information about a potential indirect effect in order for it to be reasonably foreseeable such that an agency is required to consider it under NEPA.[8]  No such information was available to FERC here.

---

[8] *See, e.g.*, *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079–82 (9th Cir. 2011) (EIS for coal railroad authorization was required to consider emissions impacts from coal mines and coal bed methane wells in area to be served, because agency had sufficiently specific information—number of wells and associated infrastructure in the area, as well a map of future mine sites—for such impacts to be reasonably foreseeable); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1195–98 (D. Colo. 2014) (EIS for document addressing road construction to facilitate coal mining was required to consider impacts of increased emissions from mining and combustion of coal, because agency knew exactly which three mines would be expanded, already had emissions data for them, and had projected how much additional coal would be produced by them); *see also WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation & Enforcement*, ___ F. Supp. 3d ___, 2015 WL 2207834, at *7, *15 (D. Colo. May 8, 2015) (agency knew both how much coal would be mined, and—due to commercial arrangements—where and how it would be combusted); *Diné Citizens Against Ruining the Env't v. U.S. Office of Surface Mining, Reclamation & Enforcement*, ___ F. Supp. 3d ___, 2015 WL 996605, at *6 (D. Colo. Mar. 2, 2015) (agency knew how much coal would be combusted, and there was "no uncertainty as to the location, the method, or the timing of this combustion").

1.    **FERC Properly Determined That Sierra Club's Reliance On The EIA Study Was Misplaced.**

Sierra Club's argument that there will necessarily be reasonably foreseeable impacts from increased natural gas production and coal consumption induced by the Amendment relies almost entirely on the EIA Study.  *See*, *e.g.*, Sierra Club Br. 37–39.  But as FERC reasonably explained, rather than providing the specific, particularized information that NEPA requires, that study was "a general economic forecast" that was not "specific to the Liquefaction Project."  JA___ [2012 Reh'g Order ¶ 14].  FERC pointed out that the study acknowledged that "'projections of energy markets over the long term are 'highly uncertain and subject to many events that cannot be foreseen,'" and concluded that the study "does not assist the Commission in reasonably estimating how much of the Liquefaction Project's export volumes will come from current versus future shale production … much less any associated environmental impacts."  *Id.*; *see also* JA___ [Reh'g Order ¶ 13].  As FERC now correctly notes, the EIA Study "is merely a prediction based on hypotheticals."  FERC Br. 36.

The EIA's generalized projections do not establish additional natural gas production and coal consumption are reasonably foreseeable impacts of the Amendment, because "broad statistical data discussing general national trends" are not enough.  *Coliseum Sq.*, 465 F.3d at 238.  Although Sierra Club asserts that the

EIA "confirmed" that the Amendment "will" have the impacts Sierra Club posits, Sierra Club Br. 6, 40, 48 n.15, the study makes no such findings.

DOE requested that the EIA make domestic energy market projections under several specified hypothetical scenarios of natural gas exports, supply situation, and general economic growth. *See* 77 Fed. Reg. at 73,628; *see also* JA___ [EIA Study at 1] (listing scenarios). The EIA Study accordingly noted that "[t]he projections in this report are not statements of what ***will*** happen but of what ***might*** happen, given the assumptions and methodologies used." JA___ [*Id.* at ii]. It generally projected the sources of additional natural gas production (with geographically non-specific references to "shale gas, tight gas, coalbed, and other sources"), as well as the sectors in which consumption might decrease, but cautioned that "projections of energy markets over a 25-year period are highly uncertain and subject to many events that cannot be foreseen." JA___ [*Id.* at 11, 3]. It also warned that the modeling on which it had relied "is not a world energy model and does not address the interaction between the potential for additional U.S. natural gas exports and developments in world natural gas markets," nor "the impact of energy price changes on the global utilization pattern for existing capacity or the siting of new capacity inside or outside of the United States in energy-intensive industries." JA___ [*Id.* at 3]. Indeed, the second part of the Export Study noted that the EIA's analyses had been "limited to the relationship

25

between export levels and domestic prices without, for example, considering whether or not those quantities of exports could be sold at high enough world prices to support the calculated domestic prices." JA___ [Intervention Mot., Ex. 3 at 3].  It found that the highest export-level scenarios—and corresponding prices— considered by the EIA were "not likely."  JA___ [*Id.* at 9].

Furthermore, even the EIA's projections of natural gas production (and greenhouse gas emissions) indicate that supply and economic circumstances, rather than any FERC authorization, will be determinative factors in increasing natural gas production and coal consumption.  For instance, the EIA projected that U.S. natural gas production would be substantially higher assuming optimistic supply forecasts and ***no*** additional exports (27.48 trillion cubic feet annually between 2015 and 2035) than assuming high export levels and pessimistic supply forecasts (22.86).  *See* JA___ [EIA Study at Table B5].  (Notably, the EIA also later acknowledged that levels of future LNG exports were highly uncertain and dependent upon domestic and international factors that are difficult to anticipate. *See supra* at 11 n.5.)  Because natural gas production may increase regardless of exports, FERC found that Sabine Pass "does not, and really cannot, estimate how much of the export volumes will come from current shale gas production and how much, if any, will be new production 'attributable' to the project." JA___ [2012 Authorizing Order ¶ 98].

26

FERC therefore concluded that "[a]n overall increase in nationwide production of shale-gas may occur for a variety of reasons," and pointed out that the Liquefaction Project "does not depend on additional shale gas production which may occur for reasons unrelated to the project." *Id.* Indeed, as FERC notes, the Liquefaction Project as now permitted is bidirectional, which allows Sabine Pass to adjust to varying market conditions. *See* FERC Br. 13. Likewise, DOE has explained that "[f]undamental uncertainties constrain the ability to predict what, if any, domestic natural gas production would be induced by granting any specific [export] authorization…." 79 Fed. Reg. at 32,259. Thus, while DOE's Environmental Addendum attempted to provide generalized information regarding the environmental impacts of natural gas production, DOE emphasized that this was "not required by … NEPA." 79 Fed. Reg. at 48,132.

As both the EIA and DOE acknowledged, increases or decreases in natural gas production or prices over the next 25 years may—or may not—occur due to general market forces, and regulatory, technological, and other developments having nothing to do with the Amendment or any other export decision. Accordingly, nothing in the EIA Study or the Environmental Addendum undermines FERC's conclusion—to which substantial deference is owed—that the purported impacts posited by Sierra Club are not reasonably foreseeable so as to meaningfully affect FERC's decisionmaking process.

**2.  FERC Properly Determined That The Impacts Alleged By Sierra Club Are Overly Speculative.**

FERC also explained that "[e]ven if [it were] able to confidently state that the Liquefaction Project will induce shale development in a particular area, … any *impacts* which may result from future shale development are not 'reasonably foreseeable.'"  JA___ [2012 Reh'g Order ¶ 13].  Sierra Club alleges that increased pollution will necessarily occur, Sierra Club Br. 16, but FERC has explained that the location of any natural gas production activity theoretically induced by the Amendment "is unknown, and too speculative to assume based on the interconnected interstate natural gas pipeline system."  JA___ [2012 Reh'g Order ¶ 10]; *see also* JA___ [Reh'g Order ¶ 10] ("[N]o specific shale-gas play had been identified….").  DOE has agreed that a lack of specific information means that an agency "cannot meaningfully analyze the specific environmental impacts of [natural gas] production."  79 Fed. Reg. at 32,259.  Contrary to Sierra Club's characterization, FERC did not require that there be "absolute certainty," Sierra Club Br. 53, regarding the location of any natural gas production or coal-switching that might occur.  Rather, it reasonably concluded that there was no non-speculative data on such impacts that would meaningfully inform its decision.

The situation here is thus distinguishable from *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520 (8th Cir. 2003), in which the EIS for a coal railroad failed to consider foreseeable indirect effects in the form

28

of emissions from coal-fired power plants. *Mid States* involved far more certain and specific information about these effects than is the case here. First, the agency itself had said during the NEPA scoping process that it would "'[e]valuate the potential air quality impacts associated with the increased availability and utilization of Powder River Basin Coal,'" but then inexplicably failed to do so in its EIS. *Id.* at 550.[9] Furthermore, the amount of coal being mined (and then combusted) was known, and the agency had acknowledged the demand for it. *See id.* at 548–49. Ultimately, the court in *Mid States* found it not only "reasonably foreseeable," but "almost certainly true" that the railroad would lead to increased emissions from coal-fired power plants. *Id.* at 549. In this regard, *Mid States* is similar to other cases finding indirect emissions impacts from coal mining to be reasonably foreseeable, because of specific information regarding the location, amount, and timing of coal to be mined and combusted as a result of federal authorization. *See supra* at 23 n.8 (summarizing cases); *see also* JA___–___ [2012 Reh'g Order ¶¶ 15–17]. Such cases present a very different situation from FERC's authorization of additional capacity for the Liquefaction Project, which does not

---

[9] The two cases on which Sierra Club relies most, *Mid States Coalition* and *New York*, both involved agencies that had acknowledged certain potential effects but then failed to analyze them. *See supra* at 18. In contrast, FERC and DOE have consistently maintained that the alleged impacts to which Sierra Club points are not reasonably foreseeable.

depend on additional natural gas production that is driven by supply and other economic factors.[10]

Sierra Club incorrectly contends that a lack of specific information about natural gas production is immaterial to reasonable foreseeability, because the climate change-related impacts of greenhouse gas emissions do not depend on where emissions are produced.  *See* Sierra Club Br. 54; *see also id.* at 18.  In the first place, as discussed below, emissions from natural gas production and coal-fired power plants are increasingly subject to EPA regulation, so it would be speculative for FERC to engage in the sort of abstract, market-based analyses of environmental impacts on which Sierra Club relies.  Furthermore, Sierra Club's argument that FERC can meaningfully assess climate-change impacts oversimplifies the globally interconnected nature of greenhouse gas emissions.

As the Supreme Court has noted, "[g]reenhouse gases once emitted 'become well mixed in the atmosphere'; emissions in New Jersey may contribute no more to flooding in New York than emissions in China."  *Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2536 (2011) (internal citation omitted).  And while

---

[10] Airport runway expansion cases, such as *Barnes v. U.S. Department of Transportation*, 655 F.3d 1124, 1138 (9th Cir. 2011), also present a different situation, with the court there saying that its precedent had "consistently noted that a new runway has a unique potential to spur demand," contradicting the defendant's conclusory argument to the contrary.

EPA has authority to regulate domestic greenhouse gas emissions, *see Massachusetts v. EPA*, 549 U.S. 497 (2007), global emissions depend on foreign sovereigns.  In draft guidance on how to consider the effects of greenhouse gas emissions during the NEPA process, the Council on Environmental Quality acknowledged that the issue presents a "complex challenge," gave agencies "substantial discretion," and "reject[ed] a hard and fast rule requiring or prohibiting consideration of indirect emissions," saying that "[t]he focus should be and remains on the foreseeability of identifying potential effects."  79 Fed. Reg. 77,802, 77,823, 77,824, 77,815 (Dec. 24, 2014).  American natural gas exports could displace less environmentally-friendly fuels abroad—as apparently contemplated by the President's *Climate Action Plan, see supra* at 20–21—but it would be an overly speculative exercise, and therefore one that NEPA does not require, for FERC to attempt to analyze global climate change impacts purportedly attributable to the Amendment.

### C.     The Impacts Alleged By Sierra Club Are Insufficiently Causally Connected To The Amendment To Qualify As Indirect Effects.

As FERC stated, potential environmental impacts also do not qualify as "indirect effects" under NEPA if they are "too … attenuated" from the action under review.  JA___ [Amending Order ¶ 14].  FERC reasonably concluded that this was the case for the impacts alleged by Sierra Club, noting for instance that additional gas production "may occur for reasons unrelated to the project and over

which the Commission has no control." JA___ [Reh'g Order ¶ 14]; *see also*

JA___–___ [2012 Reh'g Order ¶ 12].  The attenuated causal chain between the

Amendment and the impacts of emissions from increased natural gas consumption

and coal consumption means that analysis of such impacts would not yield useful

information for FERC, and therefore that such analysis was not required under

NEPA's rule of reason.

The definition of "indirect effects" requires—over and above reasonable

foreseeability—that the effect in question be "***caused by*** the action."  40 C.F.R. §

1508.8(b) (emphasis added).  There must be "'a reasonably close causal

relationship' between the environmental effect and the alleged cause" in order "to

make an agency responsible for a particular effect under NEPA."  *Pub. Citizen*,

541 U.S. at 767 (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460

U.S. 766, 774 (1983)).  The Supreme Court has analogized to "the familiar

doctrine of proximate cause from tort law," explaining that "[s]ome effects that are

'caused by' a change in the physical environment in the sense of 'but for'

causation, will nonetheless not fall within [42 U.S.C. § 4332] because the causal

chain is too attenuated."  *Metro. Edison*, 460 U.S. at 774; *see also Pub. Citizen*,

541 U.S. at 767 ("[A] 'but for' causal relationship is insufficient….").

To determine whether an agency must consider a particular effect, "courts

must 'look to the underlying policies or legislative intent in order to draw a

manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Metro. Edison*, 460 U.S. at 774 n.7. Thus, in *Public Citizen* the Court held that the Federal Motor Carrier Safety Administration's NEPA environmental assessment for safety regulations applicable to Mexican trucks—which would newly be permitted to operate in the United States following the President's lifting of a moratorium—was only required to evaluate the effects of the regulations themselves (e.g., emissions during roadside inspections), and not the broader effects of the Mexican trucks' newfound U.S. presence, which the agency had no discretion to prevent. *See* 541 U.S. at 768–69 (requiring agency to consider impacts of truck emissions that it lacked authority to prevent would not fulfill NEPA's purposes).

Similarly, Section 1 of the NGA specifies that FERC has no authority over "the production or gathering of natural gas." 15 U.S.C. § 717(b) (2012); *see Oneok*, 135 S. Ct. at 1596. Nor does it have authority over power plant emissions. Natural gas production is subject to "state permitting," JA___ [Amending Order ¶ 15]. And emissions from both natural gas production and coal-fired power plants are now increasingly subject to EPA regulation under the Clean Air Act.[11]

---

[11] *See* 77 Fed. Reg. 49,490 (Aug. 16, 2012) (establishing new source performance standards for natural gas production and processing facilities); 79 Fed. Reg. at 1430 (proposing performance standards for new fossil fuel-fired power plants); 79 Fed. Reg. 34,830 (June 18, 2014) (proposing guidelines for

FERC's lack of authority over the very environmental impacts with which Sierra Club is concerned strains the already-weak causal chain between authorization of an LNG export facility and those impacts past the breaking point. As in *Public Citizen*, NEPA's rule of reason does not require FERC to speculate on impacts regulated by other agencies and not proximately caused by the Amendment. *See* 541 U.S. at 768–70.[12]

---

states in developing plans to address greenhouse gas emissions from existing fossil fuel-fired power plants); 79 Fed. Reg. 34,960 (June 18, 2014) (proposing performance standards for emissions from modified and reconstructed fossil fuel-fired power plants); *see also* 79 Fed. Reg. 65,482 (Nov. 4, 2014) (proposing guidelines for U.S. territories and Indian country); *supra* at 20.

[12] *See also Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 709, 710 (6th Cir. 2014) (EA for Clean Water Act permit for coal mining operation was not required to consider effects of entire mining operation, in light of "Congress's intent to place primary responsibility for surface mining with state regulators," and stating that "agencies may reasonably limit their NEPA review to only those effects proximately caused by the actions over which they have regulatory responsibility"); *Hall*, 562 F.3d at 719 ("[T]he effects of establishing the refuge, and thus precluding the reservoir, are highly speculative and cannot be shown to be the proximate cause of future water shortages…."); *N.J. Dep't of Envtl. Prot. v. U.S. Nuclear Regulatory Comm'n*, 561 F.3d 132, 139, 140 (3d Cir. 2009) (agency weighing relicensing of nuclear facility was not required to consider effects of terrorist airplane attacks, because agency had "no authority over the airspace above its facilities," such that the prospect of "a terrorist aircraft attack lengthens the causal chain beyond the 'reasonably close causal relationship' required"); *Waterworth*, 420 F.3d at 452 (EIS for ship terminal construction was not required to consider effects of hypothetical future deepening of the ship channel, noting that "the deepening of the Houston Ship Channel, if it ever occurs, would not be treated as [an] 'indirect effect' 'caused' by the Corps' decision," because the ship channel could "only be deepened by an Act of Congress").

34

Sierra Club says there is no causation problem, because FERC has the *de facto* "'ability to prevent'" natural gas production.  *See* Sierra Club Br. 57 (quoting *Pub. Citizen*, 541 U.S. at 770).  That argument is contradicted by *Public Citizen*, whose NEPA analysis (like that of the other case law cited, *see supra* at 34 n.12) focused on the fact that the agency had "no **statutory authority** to impose or enforce emissions controls or to establish environmental requirements unrelated to" its narrow regulatory purview.  541 U.S. at 759 (emphasis added).  Congress plainly did not give FERC such statutory authority in the NGA.  The argument is also contradicted by the EIA Study's projections—on which Sierra Club leans so heavily—that natural gas production may increase regardless of whether there are more exports.  *See supra* at 26.  FERC reasonably determined that because natural gas production may (or may not) increase over the next quarter century due to domestic and worldwide market conditions, technological and other developments, and the actions of numerous other federal, state and local regulators, the Amendment is not the "legally relevant cause," *Pub. Citizen*, 541 U.S. at 769, of such putative production.[13]

---

[13] *Florida Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008), cited by Sierra Club, did not involve NEPA.  In any event, the agency there had legal authority to decline to issue flood insurance where it would cause the environmental harm of which the plaintiffs had complained.  *See id.* at 1144.

## II. FERC WAS NOT REQUIRED TO CONSIDER THE CUMULATIVE IMPACTS OF INCREASED NATURAL GAS PRODUCTION THEORETICALLY ATTRIBUTABLE TO ALL PENDING LNG EXPORT PROPOSALS.

As FERC has explained, *see* FERC Br. 41–46, Sierra Club's cumulative impacts argument is both jurisdictionally barred and without merit. Sierra Club waived this argument by failing to raise it in its request for rehearing of the Amending Order. *See* 15 U.S.C. § 717r(b). Unlike those underlying Sierra Club's other petitions pending before this Court,[14] Sierra Club's request for rehearing here did not argue that FERC's cumulative impacts analysis was inadequate for failure to consider the impacts of all pending LNG export facilities nationwide, but only insofar as it insufficiently considered cumulative impacts of pending expansions *of the Liquefaction Project and its associated pipeline*. *See* JA___ [Reh'g Req. at 6].

In any event, the argument that FERC was required to consider impacts of increased natural gas production nationwide theoretically induced by all pending LNG export facility proposals disregards that "cumulative impact," 40 C.F.R. § 1508.7, only includes cognizable indirect effects. An agency's cumulative impacts analysis need only consider "'expected impacts from these other actions.'" *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (quoting

---

[14] *See Sierra Club v. FERC*, No. 14-1275; *Sierra Club v. FERC*, No. 15-1133; *see also Sierra Club v. FERC*, No. 14-1190.

*Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002)).  The cumulative

impact to which Sierra Club points consists of putative indirect effects from

increased natural gas production and coal consumption.  As already explained,

however, these are not cognizable indirect effects of a FERC authorization.

Therefore, FERC reasonably concluded that "such additional development, or any

correlative potential impacts, is not an 'effect' of the Liquefaction Project for

purposes of a cumulative impacts analysis."  JA___ [Amending Order ¶ 15]; *see*

*Waterworth*, 420 F.3d at 453 (agency's "obligation under NEPA to consider

cumulative impacts is confined to impacts that are 'reasonably foreseeable'").

Moreover, Sierra Club's argument assumes that any LNG export facility

pending before FERC is a "reasonably foreseeable future action[]" as required to

fit the definition of "cumulative impact," 40 C.F.R. § 1508.7.  But this Court has

acknowledged that in the energy sector even proposed projects may not be

"reasonably foreseeable."  *See*, *e.g.*, *WildEarth Guardians v. Jewell*, 738 F.3d 298,

310 (D.C. Cir. 2013) (upholding omission of mining leases from cumulative

impacts analysis even though applications had been submitted); *Theodore*

*Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 513 (D.C. Cir. 2010)

(upholding omission of natural gas production projects from analysis

notwithstanding notices of intent to prepare EIS).  LNG terminals warrant such an

approach: DOE has cautioned that an NGA Section 3 authorization "does not

guarantee that a particular facility would be financed and built," much less "that, even if built, market conditions would continue to favor export once the facility is operational."  79 Fed. Reg. at 32,259.  "Numerous LNG import facilities were previously authorized by DOE, received financing, and were built, only to see declining use over the past decade."  *Id.*

## CONCLUSION

For these reasons, and those in the other respondents' briefs, the petition for review should be denied.

Respectfully submitted,

/s/ Jonathan S. Franklin

Lisa M. Tonery                              Jonathan S. Franklin
Charles R. Scott                            NORTON ROSE FULBRIGHT US LLP
NORTON ROSE FULBRIGHT US LLP 799 9th St., N.W.
666 Fifth Ave.                              Washington, D.C. 20004
New York, N.Y. 10103                        (202) 662-0466
(212) 318-3278                              jonathan.franklin@nortonrosefulbright.com

                                            Counsel for Sabine Pass Liquefaction, LLC
August 13, 2015                             and Sabine Pass LNG, L.P.

38

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of D.C. Cir. R. 32(a)(2)(B) because this brief contains 8740 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface.

/s/ Jonathan S. Franklin
Jonathan S. Franklin
Counsel for Sabine Pass Liquefaction,
LLC and Sabine Pass LNG, L.P.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on August 13, 2015.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

/s/ Jonathan S. Franklin
Jonathan S. Franklin
Counsel for Sabine Pass Liquefaction,
LLC and Sabine Pass LNG, L.P.

# Addendum

## TABLE OF CONTENTS

(Except for the following, applicable statutes, etc. are contained in the Brief for Petitioner Sierra Club and the Brief for Respondent Federal Energy Regulatory Commission.)

Addendum Page

15 U.S.C. § 717 (2012) ..................................................................................1

15 U.S.C. § 717n (2012) ...............................................................................3

42 U.S.C. § 7172 (2012) ...............................................................................5

Excerpts from 10 C.F.R. Part 1021, Subpart D, App. B (2015) ...........8

40 C.F.R. § 1508.25 (2014)...........................................................................11

U.S. Dep't of Energy, Redelegation Order No. 00-006.02 (Nov. 17, 2014) ........13

clude, in addition to the President, any agency, officer, or employee who may be designated by the President for the execution of any of the powers and functions vested in the President under this chapter.

(Feb. 22, 1935, ch. 18, § 11, 49 Stat. 33.)

DELEGATION OF FUNCTIONS

Ex. Ord. No. 6979, Feb. 28, 1935, which designated and appointed Secretary of the Interior to execute powers and functions vested in President by this chapter except those vested in him by section 715c of this title, was superseded by Ex. Ord. No. 10752, set out below.

Ex. Ord. No. 7756, Dec. 1, 1937, 2 F.R. 2664, which delegated to Secretary of the Interior powers and functions vested in President under this chapter except those vested in him by section 715c of this title, and authorized Secretary to establish a Petroleum Conservation Division in Department of the Interior, the functions and duties of which shall be: (1) to assist, in such manner as may be prescribed by Secretary of the Interior, in administering said act, (2) to cooperate with oil and gas-producing States in prevention of waste in oil and gas production and in adoption of uniform oil- and gas-conservation laws and regulations, and (3) to keep informed currently as to facts which may be required for exercise of responsibility of President under section 715c of this title, was superseded by Ex. Ord. No. 10752, set out below.

EX. ORD. NO. 10752. DELEGATION OF FUNCTIONS TO THE SECRETARY OF THE INTERIOR

Ex. Ord. No. 10752, Feb. 12, 1958, 23 F.R. 973, provided:

SECTION 1. The Secretary of the Interior is hereby designated and appointed as the agent of the President for the execution of all the powers and functions vested in the President by the act of February 22, 1935, 49 Stat. 30, entitled "An Act to regulate interstate and foreign commerce in petroleum and its products by prohibiting the shipment in such commerce of petroleum and its products produced in violation of State law, and for other purposes," as amended (15 U.S.C. 715 *et seq.*), except those vested in the President by section 4 of the act (15 U.S.C. 715c).

SEC. 2. The Secretary of the Interior may make such provisions in the Department of the Interior as he may deem appropriate to administer the said act.

SEC. 3. This Executive order supersedes Executive Order No. 6979 of February 28, 1935, Executive Order No. 7756 of December 1, 1937 (2 F.R. 2664), Executive Order No. 9732 of June 3, 1946 (11 F.R. 5985), and paragraph (q) of section 1 of Executive Order No. 10250 of June 5, 1951 (16 F.R. 5385).

DWIGHT D. EISENHOWER.

## § 715k. Saving clause

If any provision of this chapter, or the application thereof to any person or circumstance, shall be held invalid, the validity of the remainder of the chapter and the application of such provision to other persons or circumstances shall not be affected thereby.

(Feb. 22, 1935, ch. 18, § 12, 49 Stat. 33.)

## § 715*l*. Repealed. June 22, 1942, ch. 436, 56 Stat. 381

Section, acts Feb. 22, 1935, ch. 18, § 13, 49 Stat. 33; June 14, 1937, ch. 335, 50 Stat. 257; June 29, 1939, ch. 250, 53 Stat. 927, provided for expiration of this chapter on June 30, 1942.

## § 715m. Cooperation between Secretary of the Interior and Federal and State authorities

The Secretary of the Interior, in carrying out this chapter, is authorized to cooperate with Federal and State authorities.

(June 25, 1946, ch. 472, § 3, 60 Stat. 307.)

CODIFICATION

Section was not enacted as a part act Feb. 22, 1935, which comprises this chapter.

DELEGATION OF FUNCTIONS

Delegation of President's authority to Secretary of the Interior, see note set out under section 715j of this title.

## CHAPTER 15B—NATURAL GAS

| Sec. | |
|---|---|
| 717. | Regulation of natural gas companies. |
| 717a. | Definitions. |
| 717b. | Exportation or importation of natural gas; LNG terminals. |
| 717b–1. | State and local safety considerations. |
| 717c. | Rates and charges. |
| 717c–1. | Prohibition on market manipulation. |
| 717d. | Fixing rates and charges; determination of cost of production or transportation. |
| 717e. | Ascertainment of cost of property. |
| 717f. | Construction, extension, or abandonment of facilities. |
| 717g. | Accounts; records; memoranda. |
| 717h. | Rates of depreciation. |
| 717i. | Periodic and special reports. |
| 717j. | State compacts for conservation, transportation, etc., of natural gas. |
| 717k. | Officials dealing in securities. |
| 717*l*. | Complaints. |
| 717m. | Investigations by Commission. |
| 717n. | Process coordination; hearings; rules of procedure. |
| 717*o*. | Administrative powers of Commission; rules, regulations, and orders. |
| 717p. | Joint boards. |
| 717q. | Appointment of officers and employees. |
| 717r. | Rehearing and review. |
| 717s. | Enforcement of chapter. |
| 717t. | General penalties. |
| 717t–1. | Civil penalty authority. |
| 717t–2. | Natural gas market transparency rules. |
| 717u. | Jurisdiction of offenses; enforcement of liabilities and duties. |
| 717v. | Separability. |
| 717w. | Short title. |
| 717x. | Conserved natural gas. |
| 717y. | Voluntary conversion of natural gas users to heavy fuel oil. |
| 717z. | Emergency conversion of utilities and other facilities. |

## § 717. Regulation of natural gas companies

### (a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

### (b) Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial,

or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

**(c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence**

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities are subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

**(d) Vehicular natural gas jurisdiction**

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is—

(1) not otherwise a natural-gas company; or
(2) subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

(June 21, 1938, ch. 556, §1, 52 Stat. 821; Mar. 27, 1954, ch. 115, 68 Stat. 36; Pub. L. 102–486, title IV, §404(a)(1), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, §311(a), Aug. 8, 2005, 119 Stat. 685.)

AMENDMENTS

2005—Subsec. (b). Pub. L. 109–58 inserted "and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation," after "such transportation or sale,".
1992—Subsec. (d). Pub. L. 102–486 added subsec. (d).
1954—Subsec. (c). Act Mar. 27, 1954, added subsec. (c).

TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

Federal Power Commission terminated and functions, personnel, property, funds, etc., transferred to Secretary of Energy (except for certain functions transferred to Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

STATE LAWS AND REGULATIONS

Section 404(b) of Pub. L. 102–486 provided that: "The transportation or sale of natural gas by any person who

is not otherwise a public utility, within the meaning of State law—

"(1) in closed containers; or
"(2) otherwise to any person for use by such person as a fuel in a self-propelled vehicle,

shall not be considered to be a transportation or sale of natural gas within the meaning of any State law, regulation, or order in effect before January 1, 1989. This subsection shall not apply to any provision of any State law, regulation, or order to the extent that such provision has as its primary purpose the protection of public safety."

EMERGENCY NATURAL GAS ACT OF 1977

Pub. L. 95–2, Feb. 2, 1977, 91 Stat. 4, authorized President to declare a natural gas emergency and to require emergency deliveries and transportation of natural gas until the earlier of Apr. 30, 1977, or termination of emergency by President and provided for antitrust protection, emergency purchases, adjustment in charges for local distribution companies, relationship to Natural Gas Act, effect of certain contractual obligations, administrative procedure and judicial review, enforcement, reporting to Congress, delegation of authorities, and preemption of inconsistent State or local action.

EXECUTIVE ORDER No. 11969

Ex. Ord. No. 11969, Feb. 2, 1977, 42 F.R. 6791, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, which delegated to the Secretary of Energy the authority vested in the President by the Emergency Natural Gas Act of 1977 except the authority to declare and terminate a natural gas emergency, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

PROCLAMATION No. 4485

Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, declared that a natural gas emergency existed within the meaning of section 3 of the Emergency Natural Gas Act of 1977, set out as a note above, which emergency was terminated by Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, formerly set out below.

PROCLAMATION No. 4495

Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, terminated the natural gas emergency declared to exist by Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, formerly set out above.

**§ 717a. Definitions**

When used in this chapter, unless the context otherwise requires—

(1) "Person" includes an individual or a corporation.
(2) "Corporation" includes any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, receiver or receivers, trustee or trustees of any of the foregoing, but shall not include municipalities as hereinafter defined.
(3) "Municipality" means a city, county, or other political subdivision or agency of a State.
(4) "State" means a State admitted to the Union, the District of Columbia, and any organized Territory of the United States.
(5) "Natural gas" means either natural gas unmixed, or any mixture of natural and artificial gas.
(6) "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.
(7) "Interstate commerce" means commerce between any point in a State and any point

(June 21, 1938, ch. 556, §14, 52 Stat. 828; Pub. L. 91–452, title II, §218, Oct. 15, 1970, 84 Stat. 929.)

### AMENDMENTS

1970—Subsec. (h). Pub. L. 91–452 struck out subsec. (h) which related to the immunity from prosecution of any individual compelled to testify or produce evidence, documentary or otherwise, after claiming his privilege against self-incrimination.

### EFFECTIVE DATE OF 1970 AMENDMENT

Amendment by Pub. L. 91–452 effective on sixtieth day following Oct. 15, 1970, and not to affect any immunity to which any individual is entitled under this section by reason of any testimony given before sixtieth day following Oct. 15, 1970, see section 260 of Pub. L. 91–452, set out as an Effective Date; Savings Provision note under section 6001 of Title 18, Crimes and Criminal Procedure.

### STUDY AND REPORT ON NATURAL GAS PIPELINE AND STORAGE FACILITIES IN NEW ENGLAND

Pub. L. 107–355, §26, Dec. 17, 2002, 116 Stat. 3012, provided that:

''(a) STUDY.—The Federal Energy Regulatory Commission, in consultation with the Department of Energy, shall conduct a study on the natural gas pipeline transmission network in New England and natural gas storage facilities associated with that network.

''(b) CONSIDERATION.—In carrying out the study, the Commission shall consider the ability of natural gas pipeline and storage facilities in New England to meet current and projected demand by gas-fired power generation plants and other consumers.

''(c) REPORT.—Not later than 1 year after the date of enactment of this Act [Dec. 17, 2002], the Federal Energy Regulatory Commission shall prepare and submit to the Committee on Energy and Natural Resources of the Senate and the Committee on Energy and Commerce of the House of Representatives a report containing the results of the study conducted under subsection (a), including recommendations for addressing potential natural gas transmission and storage capacity problems in New England.''

## §717n. Process coordination; hearings; rules of procedure

### (a) Definition

In this section, the term ''Federal authorization''—

(1) means any authorization required under Federal law with respect to an application for authorization under section 717b of this title or a certificate of public convenience and necessity under section 717f of this title; and

(2) includes any permits, special use authorizations, certifications, opinions, or other approvals as may be required under Federal law with respect to an application for authorization under section 717b of this title or a certificate of public convenience and necessity under section 717f of this title.

### (b) Designation as lead agency

#### (1) In general

The Commission shall act as the lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

#### (2) Other agencies

Each Federal and State agency considering an aspect of an application for Federal authorization shall cooperate with the Commission

and comply with the deadlines established by the Commission.

### (c) Schedule

#### (1) Commission authority to set schedule

The Commission shall establish a schedule for all Federal authorizations. In establishing the schedule, the Commission shall—

(A) ensure expeditious completion of all such proceedings; and

(B) comply with applicable schedules established by Federal law.

#### (2) Failure to meet schedule

If a Federal or State administrative agency does not complete a proceeding for an approval that is required for a Federal authorization in accordance with the schedule established by the Commission, the applicant may pursue remedies under section 717r(d) of this title.

### (d) Consolidated record

The Commission shall, with the cooperation of Federal and State administrative agencies and officials, maintain a complete consolidated record of all decisions made or actions taken by the Commission or by a Federal administrative agency or officer (or State administrative agency or officer acting under delegated Federal authority) with respect to any Federal authorization. Such record shall be the record for—

(1) appeals or reviews under the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), provided that the record may be supplemented as expressly provided pursuant to section 319 of that Act [16 U.S.C. 1465]; or

(2) judicial review under section 717r(d) of this title of decisions made or actions taken of Federal and State administrative agencies and officials, provided that, if the Court determines that the record does not contain sufficient information, the Court may remand the proceeding to the Commission for further development of the consolidated record.

### (e) Hearings; parties

Hearings under this chapter may be held before the Commission, any member or members thereof, or any representative of the Commission designated by it, and appropriate records thereof shall be kept. In any proceeding before it, the Commission in accordance with such rules and regulations as it may prescribe, may admit as a party any interested State, State commission, municipality or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest.

### (f) Procedure

All hearings, investigations, and proceedings under this chapter shall be governed by rules of practice and procedure to be adopted by the Commission, and in the conduct thereof the technical rules of evidence need not be applied. No informality in any hearing, investigation, or proceeding or in the manner of taking testimony shall invalidate any order, decision, rule, or regulation issued under the authority of this chapter.

(June 21, 1938, ch. 556, § 15, 52 Stat. 829; Pub. L. 109–58, title III, § 313(a), Aug. 8, 2005, 119 Stat. 688.)

REFERENCES IN TEXT

The National Environmental Policy Act of 1969, referred to in subsec. (b)(1), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§ 4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, as amended, which is classified generally to chapter 33 (§ 1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

AMENDMENTS

2005—Pub. L. 109–58 substituted ''Process coordination; hearings; rules of procedure'' for ''Hearings; rules of procedure'' in section catchline, added subsecs. (a) to (d), and redesignated former subsecs. (a) and (b) as (e) and (f), respectively.

## § 717*o*. Administrative powers of Commission; rules, regulations, and orders

The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours.

(June 21, 1938, ch. 556, § 16, 52 Stat. 830.)

## § 717p. Joint boards

### (a) Reference of matters to joint boards; composition and power

The Commission may refer any matter arising in the administration of this chapter to a board to be composed of a member or members, as determined by the Commission, from the State or each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The Board shall be appointed by the Commission from persons nominated by the State commission of each State affected, or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

### (b) Conference with State commissions regarding rate structure, costs, etc.

The Commission may confer with any State commission regarding rate structures, costs, accounts, charges, practices, classifications, and regulations of natural-gas companies; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

### (c) Information and reports available to State commissions

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of natural-gas companies. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may, upon request from a State commission, make available to such State commission as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 21, 1938, ch. 556, § 17, 52 Stat. 830.)

## § 717q. Appointment of officers and employees

The Commission is authorized to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter; and the Commission may, subject to civil-service laws, appoint such other officers and employees as are necessary for carrying out such functions and fix their salaries in accordance with chapter 51 and subchapter III of chapter 53 of title 5.

(June 21, 1938, ch. 556, § 18, 52 Stat. 831; Oct. 28, 1949, ch. 782, title XI, § 1106(a), 63 Stat. 972.)

CODIFICATION

Provisions that authorized the Commission to appoint and fix the compensation of such officers, attor-

## § 7172. Jurisdiction of Commission

### (a) Transfer of functions from Federal Power Commission

(1) There are transferred to, and vested in, the Commission the following functions of the Federal Power Commission or of any member of the Commission or any officer or component of the Commission:

(A) the investigation, issuance, transfer, renewal, revocation, and enforcement of licenses and permits for the construction, operation, and maintenance of dams, water conduits, reservoirs, powerhouses, transmission lines, or other works for the development and improvement of navigation and for the development and utilization of power across, along, from, or in navigable waters under part I of the Federal Power Act [16 U.S.C. 791a et seq.];

(B) the establishment, review, and enforcement of rates and charges for the transmission or sale of electric energy, including determinations on construction work in progress, under part II of the Federal Power Act [16 U.S.C. 824 et seq.], and the interconnection, under section 202(b), of such Act [16 U.S.C. 824a(b)], of facilities for the generation, transmission, and sale of electric energy (other than emergency interconnection);

(C) the establishment, review, and enforcement of rates and charges for the transportation and sale of natural gas by a producer or gatherer or by a natural gas pipeline or natural gas company under sections 1, 4, 5, and 6 of the Natural Gas Act [15 U.S.C. 717, 717c to 717e];

(D) the issuance of a certificate of public convenience and necessity, including abandonment of facilities or services, and the establishment of physical connections under section 7 of the Natural Gas Act [15 U.S.C. 717f];

(E) the establishment, review, and enforcement of curtailments, other than the establishment and review of priorities for such curtailments, under the Natural Gas Act [15 U.S.C. 717 et seq.]; and

(F) the regulation of mergers and securities acquisition under the Federal Power Act [16 U.S.C. 791a et seq.] and Natural Gas Act [15 U.S.C. 717 et seq.].

(2) The Commission may exercise any power under the following sections to the extent the Commission determines such power to be necessary to the exercise of any function within the jurisdiction of the Commission:

(A) sections 4, 301, 302, 306 through 309, and 312 through 316 of the Federal Power Act [16 U.S.C. 797, 825, 825a, 825e to 825h, 825k to 825o]; and

(B) sections 8, 9, 13 through 17, 20, and 21 of the Natural Gas Act [15 U.S.C. 717g, 717h, 717l to 717p, 717s, 717t].

### (b) Repealed. Pub. L. 103–272, § 7(b), July 5, 1994, 108 Stat. 1379

### (c) Consideration of proposals made by Secretary to amend regulations issued under section 753 of title 15; exception

(1) Pursuant to the procedures specified in section 7174 of this title and except as provided in paragraph (2), the Commission shall have jurisdiction to consider any proposal by the Secretary to amend the regulation required to be issued under section 753(a)[1] of title 15 which is required by section 757 or 760a[1] of title 15 to be transmitted by the President to, and reviewed by, each House of Congress, under section 6421 of this title.

(2) In the event that the President determines that an emergency situation of overriding national importance exists and requires the expeditious promulgation of a rule described in paragraph (1), the President may direct the Secretary to assume sole jurisdiction over the promulgation of such rule, and such rule shall be transmitted by the President to, and reviewed by, each House of Congress under section 757 or 760a[1] of title 15, and section 6421 of this title.

### (d) Matters involving agency determinations to be made on record after agency hearing

The Commission shall have jurisdiction to hear and determine any other matter arising under any other function of the Secretary—

(1) involving any agency determination required by law to be made on the record after an opportunity for an agency hearing; or

(2) involving any other agency determination which the Secretary determines shall be made on the record after an opportunity for an agency hearing,

except that nothing in this subsection shall require that functions under sections 6213 and 6214[1] of this title shall be within the jurisdiction of the Commission unless the Secretary assigns such a function to the Commission.

### (e) Matters assigned by Secretary after public notice and matters referred under section 7174 of this title

In addition to the other provisions of this section, the Commission shall have jurisdiction over any other matter which the Secretary may assign to the Commission after public notice, or which are required to be referred to the Commission pursuant to section 7174 of this title.

### (f) Limitation

No function described in this section which regulates the exports or imports of natural gas or electricity shall be within the jurisdiction of the Commission unless the Secretary assigns such a function to the Commission.

### (g) Final agency action

The decision of the Commission involving any function within its jurisdiction, other than action by it on a matter referred to it pursuant to section 7174 of this title, shall be final agency action within the meaning of section 704 of title 5 and shall not be subject to further review by the Secretary or any officer or employee of the Department.

### (h) Rules, regulations, and statements of policy

The Commission is authorized to prescribe rules, regulations, and statements of policy of general applicability with respect to any function under the jurisdiction of the Commission pursuant to this section.

---

[1] See References in Text note below.

(Pub. L. 95–91, title IV, §402, Aug. 4, 1977, 91 Stat. 583; Pub. L. 103–272, §7(b), July 5, 1994, 108 Stat. 1379.)

### REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (a)(1)(A), (B), and (F), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§791a et seq.) of Title 16, Conservation. Parts I and II of the Federal Power Act are classified generally to subchapters I (§791a et seq.) and II (§824 et seq.), respectively, of chapter 12 of Title 16. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

The Natural Gas Act, referred to in subsec. (a)(1)(E), (F), is act June 21, 1938, ch. 556, 52 Stat. 821, as amended, which is classified generally to chapter 15B (§717 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 717w of Title 15 and Tables.

Sections 753, 757, and 760a of title 15, referred to in subsec. (c), were omitted from the Code pursuant to section 760g of Title 15, which provided for the expiration of the President's authority under those sections on Sept. 30, 1981.

Section 6214 of this title, referred to in subsec. (d), was repealed by Pub. L. 106–469, title I, §103(3), Nov. 9, 2000, 114 Stat. 2029.

### AMENDMENTS

1994—Subsec. (b). Pub. L. 103–272 struck out subsec. (b) which read as follows: "There are transferred to, and vested in, the Commission all functions and authority of the Interstate Commerce Commission or any officer or component of such Commission where the regulatory function establishes rates or charges for the transportation of oil by pipeline or establishes the valuation of any such pipeline." See section 60502 of Title 49, Transportation.

### OIL PIPELINE REGULATORY REFORM

Pub. L. 102–486, title XVIII, Oct. 24, 1992, 106 Stat. 3010, provided that:

"SEC. 1801. OIL PIPELINE RATEMAKING METHODOLOGY.

"(a) ESTABLISHMENT.—Not later than 1 year after the date of the enactment of this Act [Oct. 24, 1992], the Federal Energy Regulatory Commission shall issue a final rule which establishes a simplified and generally applicable ratemaking methodology for oil pipelines in accordance with section 1(5) of part I of the Interstate Commerce Act [former 49 U.S.C. 1(5)].

"(b) EFFECTIVE DATE.—The final rule to be issued under subsection (a) may not take effect before the 365th day following the date of the issuance of the rule.

"SEC. 1802. STREAMLINING OF COMMISSION PROCEDURES.

"(a) RULEMAKING.—Not later than 18 months after the date of the enactment of this Act [Oct. 24, 1992], the Commission shall issue a final rule to streamline procedures of the Commission relating to oil pipeline rates in order to avoid unnecessary regulatory costs and delays.

"(b) SCOPE OF RULEMAKING.—Issues to be considered in the rulemaking proceeding to be conducted under subsection (a) shall include the following:

"(1) Identification of information to be filed with an oil pipeline tariff and the availability to the public of any analysis of such tariff filing performed by the Commission or its staff.

"(2) Qualification for standing (including definitions of economic interest) of parties who protest oil pipeline tariff filings or file complaints thereto.

"(3) The level of specificity required for a protest or complaint and guidelines for Commission action on the portion of the tariff or rate filing subject to protest or complaint.

"(4) An opportunity for the oil pipeline to file a response for the record to an initial protest or complaint.

"(5) Identification of specific circumstances under which Commission staff may initiate a protest.

"(c) ADDITIONAL PROCEDURAL CHANGES.—In conducting the rulemaking proceeding to carry out subsection (a), the Commission shall identify and transmit to Congress any other procedural changes relating to oil pipeline rates which the Commission determines are necessary to avoid unnecessary regulatory costs and delays and for which additional legislative authority may be necessary.

"(d) WITHDRAWAL OF TARIFFS AND COMPLAINTS.—

"(1) WITHDRAWAL OF TARIFFS.—If an oil pipeline tariff which is filed under part I of the Interstate Commerce Act [former 49 U.S.C. 1 et seq.] and which is subject to investigation is withdrawn—

"(A) any proceeding with respect to such tariff shall be terminated;

"(B) the previous tariff rate shall be reinstated; and

"(C) any amounts collected under the withdrawn tariff rate which are in excess of the previous tariff rate shall be refunded.

"(2) WITHDRAWAL OF COMPLAINTS.—If a complaint which is filed under section 13 of the Interstate Commerce Act [former 49 U.S.C. 13] with respect to an oil pipeline tariff is withdrawn, any proceeding with respect to such complaint shall be terminated.

"(e) ALTERNATIVE DISPUTE RESOLUTION.—To the maximum extent practicable, the Commission shall establish appropriate alternative dispute resolution procedures, including required negotiations and voluntary arbitration, early in an oil pipeline rate proceeding as a method preferable to adjudication in resolving disputes relating to the rate. Any proposed rates derived from implementation of such procedures shall be considered by the Commission on an expedited basis for approval.

"SEC. 1803. PROTECTION OF CERTAIN EXISTING RATES.

"(a) RATES DEEMED JUST AND REASONABLE.—Except as provided in subsection (b)—

"(1) any rate in effect for the 365-day period ending on the date of the enactment of this Act [Oct. 24, 1992] shall be deemed to be just and reasonable (within the meaning of section 1(5) of the Interstate Commerce Act [former 49 U.S.C. 1(5)]); and

"(2) any rate in effect on the 365th day preceding the date of such enactment shall be deemed to be just and reasonable (within the meaning of such section 1(5)) regardless of whether or not, with respect to such rate, a new rate has been filed with the Commission during such 365-day period;

if the rate in effect, as described in paragraph (1) or (2), has not been subject to protest, investigation, or complaint during such 365-day period.

"(b) CHANGED CIRCUMSTANCES.—No person may file a complaint under section 13 of the Interstate Commerce Act [former 49 U.S.C. 13] against a rate deemed to be just and reasonable under subsection (a) unless—

"(1) evidence is presented to the Commission which establishes that a substantial change has occurred after the date of the enactment of this Act [Oct. 24, 1992]—

"(A) in the economic circumstances of the oil pipeline which were a basis for the rate; or

"(B) in the nature of the services provided which were a basis for the rate; or

"(2) the person filing the complaint was under a contractual prohibition against the filing of a complaint which was in effect on the date of enactment of this Act and had been in effect prior to January 1, 1991, provided that a complaint by a party bound by such prohibition is brought within 30 days after the expiration of such prohibition.

If the Commission determines pursuant to a proceeding instituted as a result of a complaint under section 13 of

the Interstate Commerce Act that the rate is not just and reasonable, the rate shall not be deemed to be just and reasonable. Any tariff reduction or refunds that may result as an outcome of such a complaint shall be prospective from the date of the filing of the complaint.

''(c) LIMITATION REGARDING UNDULY DISCRIMINATORY OR PREFERENTIAL TARIFFS.—Nothing in this section shall prohibit any aggrieved person from filing a complaint under section 13 or section 15(l) of the Interstate Commerce Act [former 49 U.S.C. 13, 15(1)] challenging any tariff provision as unduly discriminatory or unduly preferential.

''SEC. 1804. DEFINITIONS.

''For the purposes of this title, the following definitions apply:

''(1) COMMISSION.—The term 'Commission' means the Federal Energy Regulatory Commission and, unless the context requires otherwise, includes the Oil Pipeline Board and any other office or component of the Commission to which the functions and authority vested in the Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)) are delegated.

''(2) OIL PIPELINE.—

''(A) IN GENERAL.—Except as provided in subparagraph (B), the term 'oil pipeline' means any common carrier (within the meaning of the Interstate Commerce Act [former 49 U.S.C. 1 et seq.]) which transports oil by pipeline subject to the functions and authority vested in the Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)).

''(B) EXCEPTION.—The term 'oil pipeline' does not include the Trans-Alaska Pipeline authorized by the Trans-Alaska Pipeline Authorization Act (43 U.S.C. 1651 et seq.) or any pipeline delivering oil directly or indirectly to the Trans-Alaska Pipeline.

''(3) OIL.—The term 'oil' has the same meaning as is given such term for purposes of the transfer of functions from the Interstate Commerce Commission to the Federal Energy Regulatory Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)).

''(4) RATE.—The term 'rate' means all charges that an oil pipeline requires shippers to pay for transportation services.''

## § 7173. Initiation of rulemaking procedures before Commission

**(a) Proposal of rules, regulations, and statements of policy of general applicability by Secretary and Commission**

The Secretary and the Commission are authorized to propose rules, regulations, and statements of policy of general applicability with respect to any function within the jurisdiction of the Commission under section 7172 of this title.

**(b) Consideration and final action on proposals of Secretary**

The Commission shall have exclusive jurisdiction with respect to any proposal made under subsection (a) of this section, and shall consider and take final action on any proposal made by the Secretary under such subsection in an expeditious manner in accordance with such reasonable time limits as may be set by the Secretary for the completion of action by the Commission on any such proposal.

**(c) Utilization of rulemaking procedures for establishment of rates and charges under Federal Power Act and Natural Gas Act**

Any function described in section 7172 of this title which relates to the establishment of rates and charges under the Federal Power Act [16 U.S.C. 791a et seq.] or the Natural Gas Act [15 U.S.C. 717 et seq.], may be conducted by rulemaking procedures. Except as provided in subsection (d) of this section, the procedures in such a rulemaking proceeding shall assure full consideration of the issues and an opportunity for interested persons to present their views.

**(d) Submission of written questions by interested persons**

With respect to any rule or regulation promulgated by the Commission to establish rates and charges for the first sale of natural gas by a producer or gatherer to a natural gas pipeline under the Natural Gas Act [15 U.S.C. 717 et seq.], the Commission may afford any interested person a reasonable opportunity to submit written questions with respect to disputed issues of fact to other interested persons participating in the rulemaking proceedings. The Commission may establish a reasonable time for both the submission of questions and responses thereto.

(Pub. L. 95–91, title IV, § 403, Aug. 4, 1977, 91 Stat. 585.)

### REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (c), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§ 791a et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

The Natural Gas Act, referred to in subsecs. (c) and (d), is act June 21, 1938, ch. 556, 52 Stat. 821, as amended, which is classified generally to chapter 15B (§ 717 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 717w of Title 15 and Tables.

## § 7174. Referral of other rulemaking proceedings to Commission

**(a) Notification of Commission of proposed action; public comment**

Except as provided in section 7173 of this title, whenever the Secretary proposes to prescribe rules, regulations, and statements of policy of general applicability in the exercise of any function which is transferred to the Secretary under section 7151 of this title or section 60501 of title 49, he shall notify the Commission of the proposed action. If the Commission, in its discretion, determines within such period as the Secretary may prescribe, that the proposed action may significantly affect any function within the jurisdiction of the Commission pursuant to section 7172(a)(1) and (c)(1) of this title and section 60502 of title 49, the Secretary shall immediately refer the matter to the Commission, which shall provide an opportunity for public comment.

**(b) Recommendations of Commission; publication**

Following such opportunity for public comment the Commission, after consultation with the Secretary, shall either—

(1) concur in adoption of the rule or statement as proposed by the Secretary;

(2) concur in adoption of the rule or statement only with such changes as it may recommend; or

(3) recommend that the rule or statement not be adopted.

A12 EMERGENCY PREPAREDNESS PLANNING

Emergency preparedness planning activities, including, but not limited to, the designation of onsite evacuation routes.

A13 PROCEDURAL DOCUMENTS

Administrative, organizational, or procedural Policies, Orders, Notices, Manuals, and Guides.

A14 APPROVAL OF TECHNICAL EXCHANGE ARRANGEMENTS

Approval of technical exchange arrangements for information, data, or personnel with other countries or international organizations (including, but not limited to, assistance in identifying and analyzing another country's energy resources, needs and options).

A15 INTERNATIONAL AGREEMENTS FOR ENERGY RESEARCH AND DEVELOPMENT

Approval of DOE participation in international "umbrella" agreements for cooperation in energy research and development activities that would not commit the U.S. to any specific projects or activities.

APPENDIX B TO SUBPART D OF PART 1021—CATEGORICAL EXCLUSIONS APPLICABLE TO SPECIFIC AGENCY ACTIONS

TABLE OF CONTENTS

B. Conditions that Are Integral Elements of the Classes of Actions in Appendix B

B1. CATEGORICAL EXCLUSIONS APPLICABLE TO FACILITY OPERATION

B1.1 Changing rates and prices
B1.2 Training exercises and simulations
B1.3 Routine maintenance
B1.4 Air conditioning systems for existing equipment
B1.5 Existing steam plants and cooling water systems
B1.6 Tanks and equipment to control runoff and spills
B1.7 Electronic equipment
B1.8 Screened water intake and outflow structures
B1.9 Airway safety markings and painting
B1.10 Onsite storage of activated material
B1.11 Fencing
B1.12 Detonation or burning of explosives or propellants after testing
B1.13 Pathways, short access roads, and rail lines
B1.14 Refueling of nuclear reactors
B1.15 Support buildings
B1.16 Asbestos removal
B1.17 Polychlorinated biphenyl removal
B1.18 Water supply wells
B1.19 Microwave, meteorological, and radio towers
B1.20 Protection of cultural resources, fish and wildlife habitat
B1.21 Noise abatement
B1.22 Relocation of buildings
B1.23 Demolition and disposal of buildings
B1.24 Property transfers
B1.25 Real property transfers for cultural resources protection, habitat preservation, and wildlife management
B1.26 Small water treatment facilities
B1.27 Disconnection of utilities
B1.28 Placing a facility in an environmentally safe condition
B1.29 Disposal facilities for construction and demolition waste
B1.30 Transfer actions
B1.31 Installation or relocation of machinery and equipment
B1.32 Traffic flow adjustments
B1.33 Stormwater runoff control
B1.34 Lead-based paint containment, removal, and disposal
B1.35 Drop-off, collection, and transfer facilities for recyclable materials
B1.36 Determinations of excess real property

B2. CATEGORICAL EXCLUSIONS APPLICABLE TO SAFETY AND HEALTH

B2.1 Workplace enhancements
B2.2 Building and equipment instrumentation
B2.3 Personnel safety and health equipment
B2.4 Equipment qualification
B2.5 Facility safety and environmental improvements
B2.6 Recovery of radioactive sealed sources

B3. CATEGORICAL EXCLUSIONS APPLICABLE TO SITE CHARACTERIZATION, MONITORING, AND GENERAL RESEARCH

B3.1 Site characterization and environmental monitoring
B3.2 Aviation activities
B3.3 Research related to conservation of fish, wildlife, and cultural resources
B3.4 Transport packaging tests for radioactive or hazardous material
B3.5 Tank car tests
B3.6 Small-scale research and development, laboratory operations, and pilot projects
B3.7 New terrestrial infill exploratory and experimental wells
B3.8 Outdoor terrestrial ecological and environmental research
B3.9 Projects to reduce emissions and waste generation
B3.10 Particle accelerators
B3.11 Outdoor tests and experiments on materials and equipment components
B3.12 Microbiological and biomedical facilities
B3.13 Magnetic fusion experiments
B3.14 Small-scale educational facilities
B3.15 Small-scale indoor research and development projects using nanoscale materials

Addendum 8

**Department of Energy**                                       **Pt. 1021, Subpt. D, App. B**

B3.16 Research activities in aquatic environments

B4. CATEGORICAL EXCLUSIONS APPLICABLE TO ELECTRIC POWER AND TRANSMISSION

B4.1 Contracts, policies, and marketing and allocation plans for electric power
B4.2 Export of electric energy
B4.3 Electric power marketing rate changes
B4.4 Power marketing services and activities
B4.5 Temporary adjustments to river operations
B4.6 Additions and modifications to transmission facilities
B4.7 Fiber optic cable
B4.8 Electricity transmission agreements
B4.9 Multiple use of powerline rights-of-way
B4.10 Removal of electric transmission facilities
B4.11 Electric power substations and interconnection facilities
B4.12 Construction of powerlines
B4.13 Upgrading and rebuilding existing powerlines

B5. CATEGORICAL EXCLUSIONS APPLICABLE TO CONSERVATION, FOSSIL, AND RENEWABLE ENERGY ACTIVITIES

B5.1 Actions to conserve energy or water
B5.2 Modifications to pumps and piping
B5.3 Modification or abandonment of wells
B5.4 Repair or replacement of pipelines
B5.5 Short pipeline segments
B5.6 Oil spill cleanup
B5.7 Import or export natural gas, with operational changes
B5.8 Import or export natural gas, with new cogeneration powerplant
B5.9 Temporary exemptions for electric powerplants
B5.10 Certain permanent exemptions for existing electric powerplants
B5.11 Permanent exemptions allowing mixed natural gas and petroleum
B5.12 Workover of existing wells
B5.13 Experimental wells for injection of small quantities of carbon dioxide
B5.14 Combined heat and power or cogeneration systems
B5.15 Small-scale renewable energy research and development and pilot projects
B5.16 Solar photovoltaic systems
B5.17 Solar thermal systems
B5.18 Wind turbines
B5.19 Ground source heat pumps
B5.20 Biomass power plants
B5.21 Methane gas recovery and utilization systems
B5.22 Alternative fuel vehicle fueling stations
B5.23 Electric vehicle charging stations
B5.24 Drop-in hydroelectric systems
B5.25 Small-scale renewable energy research and development and pilot projects in aquatic environments

B6. CATEGORICAL EXCLUSIONS APPLICABLE TO ENVIRONMENTAL RESTORATION AND WASTE MANAGEMENT ACTIVITIES

B6.1 Cleanup actions
B6.2 Waste collection, treatment, stabilization, and containment facilities
B6.3 Improvements to environmental control systems
B6.4 Facilities for storing packaged hazardous waste for 90 days or less
B6.5 Facilities for characterizing and sorting packaged waste and overpacking waste
B6.6 Modification of facilities for storing, packaging, and repacking waste
B6.7 [Reserved]
B6.8 Modifications for waste minimization and reuse of materials
B6.9 Measures to reduce migration of contaminated groundwater
B6.10 Upgraded or replacement waste storage facilities

B7. CATEGORICAL EXCLUSIONS APPLICABLE TO INTERNATIONAL ACTIVITIES

B7.1 Emergency measures under the International Energy Program
B7.2 Import and export of special nuclear or isotopic materials

B. CONDITIONS THAT ARE INTEGRAL ELEMENTS OF THE CLASSES OF ACTIONS IN APPENDIX B

The classes of actions listed below include the following conditions as integral elements of the classes of actions. To fit within the classes of actions listed below, a proposal must be one that would not:

(1) Threaten a violation of applicable statutory, regulatory, or permit requirements for environment, safety, and health, or similar requirements of DOE or Executive Orders;

(2) Require siting and construction or major expansion of waste storage, disposal, recovery, or treatment facilities (including incinerators), but the proposal may include categorically excluded waste storage, disposal, recovery, or treatment actions or facilities;

(3) Disturb hazardous substances, pollutants, contaminants, or CERCLA-excluded petroleum and natural gas products that preexist in the environment such that there would be uncontrolled or unpermitted releases;

(4) Have the potential to cause significant impacts on environmentally sensitive resources. An environmentally sensitive resource is typically a resource that has been identified as needing protection through Executive Order, statute, or regulation by Federal, state, or local government, or a Federally recognized Indian tribe. An action may be categorically excluded if, although sensitive resources are present, the action would not have the potential to cause significant impacts on those resources (such as

Addendum 9

**Department of Energy**                                      **Pt. 1021, Subpt. D, App. B**

conditioning systems, and appliances; installation of drip-irrigation systems; improvements in generator efficiency and appliance efficiency ratings; efficiency improvements for vehicles and transportation (such as fleet changeout); power storage (such as flywheels and batteries, generally less than 10 megawatt equivalent); transportation management systems (such as traffic signal control systems, car navigation, speed cameras, and automatic plate number recognition); development of energy-efficient manufacturing, industrial, or building practices; and small-scale energy efficiency and conservation research and development and small-scale pilot projects. Covered actions include building renovations or new structures, provided that they occur in a previously disturbed or developed area. Covered actions could involve commercial, residential, agricultural, academic, institutional, or industrial sectors. Covered actions do not include rulemakings, standard-settings, or proposed DOE legislation, except for those actions listed in B5.1(b) of this appendix.

(b) Covered actions include rulemakings that establish energy conservation standards for consumer products and industrial equipment, provided that the actions would not: (1) Have the potential to cause a significant change in manufacturing infrastructure (such as construction of new manufacturing plants with considerable associated ground disturbance); (2) involve significant unresolved conflicts concerning alternative uses of available resources (such as rare or limited raw materials); (3) have the potential to result in a significant increase in the disposal of materials posing significant risks to human health and the environment (such as RCRA hazardous wastes); or (4) have the potential to cause a significant increase in energy consumption in a state or region.

*B5.2 Modifications to pumps and piping*

Modifications to existing pump and piping configurations (including, but not limited to, manifolds, metering systems, and other instrumentation on such configurations conveying materials such as air, brine, carbon dioxide, geothermal system fluids, hydrogen gas, natural gas, nitrogen gas, oil, produced water, steam, and water). Covered modifications would not have the potential to cause significant changes to design process flow rates or permitted air emissions.

*B5.3 Modification or abandonment of wells*

Modification (but not expansion) or plugging and abandonment of wells, provided that site characterization has verified a low potential for seismicity, subsidence, and contamination of freshwater aquifers, and the actions are otherwise consistent with best practices and DOE protocols, including those that protect against uncontrolled releases of

harmful materials. Such wells may include, but are not limited to, storage and injection wells for brine, carbon dioxide, coalbed methane, gas hydrate, geothermal, natural gas, and oil. Covered modifications would not be part of site closure.

*B5.4 Repair or replacement of pipelines*

Repair, replacement, upgrading, rebuilding, or minor relocation of pipelines within existing rights-of-way, provided that the actions are in accordance with applicable requirements (such as Army Corps of Engineers permits under section 404 of the Clean Water Act). Pipelines may convey materials including, but not limited to, air, brine, carbon dioxide, geothermal system fluids, hydrogen gas, natural gas, nitrogen gas, oil, produced water, steam, and water.

*B5.5 Short pipeline segments*

Construction and subsequent operation of short (generally less than 20 miles in length) pipeline segments conveying materials (such as air, brine, carbon dioxide, geothermal system fluids, hydrogen gas, natural gas, nitrogen gas, oil, produced water, steam, and water) between existing source facilities and existing receiving facilities (such as facilities for use, reuse, transportation, storage, and refining), provided that the pipeline segments are within previously disturbed or developed rights-of-way.

*B5.6 Oil spill cleanup*

Removal of oil and contaminated materials recovered in oil spill cleanup operations and disposal of these materials in accordance with applicable requirements (such as the National Oil and Hazardous Substances Pollution Contingency Plan).

*B5.7 Import or export natural gas, with operational changes*

Approvals or disapprovals of new authorizations or amendments of existing authorizations to import or export natural gas under section 3 of the Natural Gas Act that involve minor operational changes (such as changes in natural gas throughput, transportation, and storage operations) but not new construction.

*B5.8 Import or export natural gas, with new cogeneration powerplant*

Approvals or disapprovals of new authorizations or amendments of existing authorizations to import or export natural gas under section 3 of the Natural Gas Act that involve new cogeneration powerplants (as defined in the Powerplant and Industrial Fuel Use Act of 1978, as amended) within or contiguous to an existing industrial complex and requiring generally less than 10 miles of new natural gas pipeline or 20 miles within

(a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

### § 1508.20　Mitigation.

*Mitigation* includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

### § 1508.21　NEPA process.

*NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

### § 1508.22　Notice of intent.

*Notice of intent* means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

### § 1508.23　Proposal.

*Proposal* exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative

means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§ 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

### § 1508.24　Referring agency.

*Referring agency* means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

### § 1508.25　Scope.

*Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental

**Council on Environmental Quality**                                    **§ 1508.28**

consequencies together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

### § 1508.26  Special expertise.

*Special expertise* means statutory responsibility, agency mission, or related program experience.

### § 1508.27  Significantly.

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

### § 1508.28  Tiering.

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement

DEPARTMENT OF ENERGY
REDELEGATION ORDER NO. 00-006.02
TO THE ASSISTANT SECRETARY FOR FOSSIL ENERGY

1.    DELEGATION.  Pursuant to section 202(b) of the Department of Energy Organization Act (Public Law 95-91, 42 U.S.C. 7132(b)) and the Secretary of Energy's Delegation Order to the Under Secretary for Science (and Energy), I delegate to the Assistant Secretary for Fossil Energy, authority to take the following actions:

1.1    In reference to the Great Plains project under section 19(g)(2) of the Federal Non nuclear Energy Research and Development Act of 1974 (Public Law 93-577, as amended by Public Law 95-238)(the Federal Nonnuclear Act) and as provided by section 646(a) of the Department of Energy Organization Act (Public Law 95-91):

A.    Carry out all functions of the Contracting Officer as that term is defined in the Asset Purchase Agreement dated as of October 7, 1988, and amended as of October 31, 1988, February 16, 1994, and December 21, 1998, between the United States of America, Dakota Gasification Company, Dakota Coal Company and Basin Electric Power Cooperative, which was executed as part of the conveyance of the Department of Energy's (Department or DOE) interests in the Great Plains Coal Gasification Project in Beulah, North Dakota, to Dakota Gasification Company and Dakota Coal Company.

B.    Undertake all actions that are necessary and proper, on behalf of the United States of America, acting by and through the Secretary of Energy, to administer all agreements and contracts entered into by the Department of Energy in connection with the conveyance of the Department's interests in the Great Plains project.

In exercising the authority delegated by this order, the delegate may act without regard to the provisions of the Federal Property and Administrative Services Act of 1949, as amended, except section 207 of that Act (40 U. S. C. 5488), or any other law, as specifically provided for by section 19(g)(2) of the Federal Nonnuclear Act, supra.

1.2    In reference to the Naval Petroleum Reserves:

A.    Perform all functions vested in me by Subtitle B of the National Defense Authorization Act for Fiscal Year 1996 (Public Law 104-106) relating to the sale of Naval Petroleum Reserve Numbered 1, including the finalization of equity.

Addendum 13

B.  Perform the functions specified in 10 U.S.C. 7427 and 7428, and vested in me by the President of the United States in Executive Order No. 12929, in order to meet the goals and objectives of the Naval Petroleum Reserves.

C.  Perform all functions vested in me by law (10 U.S.C. 7420-7439, including 10 U.S.C. 7420 note) relating to the administration of and jurisdiction over the Naval Petroleum Reserves, except for condemnation proceedings and the execution of procurement contracts with non-Governmental entities affecting such Reserves.

D.  Perform all duties and responsibilities required by the Unit Plan Contract between the United States of America and Chevron U.S.A., Inc., numbered Nod-4219, dated June 19, 1944, as amended; the Amendatory and Supplemental Agreement, between the same parties, numbered Nod-8477, dated December 22, 1948, as amended; and the Agreement to Terminate the Unit Plan Contract, between the same parties, dated February 5, 1998.

E.  Perform all duties and responsibilities relative to the disposition of the United States share of petroleum produced from the Naval Petroleum Reserves to or for the Department of Defense and the Strategic Petroleum Reserve pursuant to 10 U.S.C. 7430(k) and (l).

F.  Perform all functions vested in me by the provisions of Section 3404(b) of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999 (Public Law 105-261; 10 USC 7420 note) for the disposition by sale, of Naval Petroleum Reserve Numbered 3.

1.3  In reference to the regulation of imports and exports of natural gas:

A.  Perform the functions vested in me by sections 301(b) and 402(f) of the Department of Energy Organization Act to regulate natural gas under section 3 of the Natural Gas Act, as amended by section 201 of the Energy Policy Act of 1992 (15 U.S.C. 717b):

1.  Consistent with the authority delegated by this Order, the Assistant Secretary may attach such terms and conditions to import and export authorizations as the Assistant Secretary shall determine to be appropriate.

2.  The authority delegated by this Order does not include the authority to approve the construction and operation of particular facilities, the site at which such facilities shall be located, and, with respect to natural gas that involves the construction of new

domestic facilities, the place of entry for imports or exit for exports, except the Assistant Secretary is authorized to disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and, with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports.

B.     Establish and review priorities for the curtailment of natural gas pursuant to the Natural Gas Act (15 U.S.C. 717), sections 401, 402, and 403 of the Natural Gas Policy Act of 1978 (Public Law 95-621, 15 U.S.C. 3391-3393); and consult with the Deputy Secretary concerning energy emergency-related curtailment policy guidance, as necessary or appropriate.

1.4    Exercise the authority of the Secretary of Energy under Subtitle J of the Energy Policy Act of 2005 (Public Law 109-58, 42 U.S.C. 16371 to 16378). The authority specifically provided to the National Energy Technology Laboratory pursuant to Subtitle J of the Energy Policy Act of 2005 shall not be affected by this Order.

1.5    Participate in any proceeding before the Federal Energy Regulatory Commission, pursuant to the provisions of section 405 of the Department of Energy Organization Act (42 U.S.C. 7175), or in any proceeding before any Federal or State agency or commission whenever such participation is related to the exercise of authority delegated to the Assistant Secretary.

1.6    Formulate and establish enforcement policy, initiate and conduct investigations, conduct conferences, administrative hearings and public hearings, prepare required reports, issue orders, and take such other action as may be necessary or appropriate to perform any of the above functions.

1.7    Under section 988 of the Energy Policy Act of 2005:

A.     Approve requests for reduction or elimination of the cost sharing requirement for research and development activity of an applied nature in accordance with 988(b)(3);

B.     Approve requests for reduction of the cost sharing requirement for the non-federal share of demonstration and commercial application activities in accordance with 988(c)(2); and

C.     Exclude research and development of a basic or fundamental nature from the cost sharing requirements, as described in 988(b)(2).

These authorities may be exercised only after providing notification to the Office of the Secretary. Furthermore, the approval Authorities

4

delegated in subparagraphs A and B can be exercised only in coordination with the Secretarial Policy Statement entitled, "Application and Reduction or Elimination of Cost Share Requirements Under Section 988 of EPACT 2005, Pub.L. 109-58." The authorities of this paragraph may be redelegated to the Chief Operating Office and no further.

1.8    Establish, alter, consolidate or discontinue such organizational units or components within assigned organizational elements as deemed to be necessary or appropriate

A.    In exercising this authority, or as redelegated pursuant thereto, delegates will be limited by approved budgets, staffing level allocations, and Senior Executive Service and other executive resource position allocations. Organizational changes shall not be announced or implemented until appropriate union coordination and other pre-release clearances have been obtained.

B.    This authority does not include approval of additional, deletion, or transfer of mission and functions of or between Departmental Headquarters or Field Elements, which authority is reserved to the Secretary.

C.    Heads of Departmental Headquarters Elements may delegate the authority to alter or consolidate organizational elements further, in whole or in part, consistent with the terms of the Department of Energy Organization Act, to an official or officials one level below the Head of the Departmental Headquarters or Field Element.

D.    The authority to establish or discontinue organizational elements at the first or second level below the Head of the Departmental Headquarters or Field Element may not be redelegated.

E.    Acting Heads of Departmental Headquarters or Field Elements may not redelegate these authorities and may only establish, alter, consolidate or discontinue organizational units at the third level and below. During the tenure of an acting Head of a Departmental Headquarters or Field Element, organizational units below the Head of the Departmental Headquarters and Field Elements may not exercise redelegations granting the authority to alter or consolidate units.

1.9    Pursuant to 18 U.S.C. 208(b)(3), after consultation with the Department's Designated Agency Ethics Official, issue conflict-of-interest waivers for special Government employees serving on a Federal Advisory Committee that is administratively supported by the Office of Fossil Energy.

1.10    For all programs funded by Fossil Energy appropriations, exercise the authority of the Secretary of Energy under the Energy and Water Development and Related Agencies Appropriations Act, 2010 (Pub. L. 111-85), Title III, Department of Energy, Energy Programs, Fossil Energy Research and Development, to vest fee title or other property interests acquired in any entity, including the United States.

1.11    Exercise the authority of the Secretary of Energy under Title IV, Subtitle A, Section 402(f) of the Energy Policy Act of 2005 (Public Law 109-58, 42 U.S.C. 15962) with respect to scheduled completion of selected Clean Coal Power Initiative projects.

2.    RESCISSION.  Redelegation Order 00-002.04F is hereby rescinded.

3.    LIMITATION.

3.1    In exercising the authority delegated in this Order, a delegate shall be governed by the rules and regulations of the Department of Energy and the policies and procedures prescribed by the Secretary or delegate(s).

3.2    Nothing in this Order precludes the Secretary or the Under Secretary for Science (and Energy) from exercising any of the authority delegated by this Order.

3.3    Nothing in this Order shall be construed to supersede or otherwise interfere with the authorities provided to the Administrator for Nuclear Security by law or by delegation.  Furthermore, nothing herein constitutes authority to exercise authority, direction, or control of an employee of the National Nuclear Security Administration or its contractors.

3.4    Any amendments to this Order shall be made in consultation with the Department of Energy General Counsel.

4.    AUTHORITY TO REDELEGATE.

4.1    Except as prohibited by law, regulation, or this Order, the Assistant Secretary for Fossil Energy may delegate this authority further, in whole or in part.

4.2    Copies of redelegations and any subsequent redelegations shall be provided to the Office of Management, which manages the Secretarial Delegations of Authority system.

6

## 5.    DURATION AND EFFECTIVE DATE.

5.1    All actions pursuant to any authority delegated prior to this Order or pursuant to any authority delegated by this Order taken prior to and in effect on the date of this Order are ratified and remain in force as if taken under this Order, unless or until rescinded, amended or superseded.

NOV 17 2014

5.2    This Order is effective _____ .

Ernest J. Moniz
Secretary of Energy

Addendum 18